PEOPLE *v.* POWELL.

1. WORDS AND PHRASES—PUBLIC—PRIVATE.
     The words ''public'' and ''private'' are generally used in contradistinction to each other, ''public'' being defined as of or pertaining to the people, relating to, belonging to, or affecting a nation, State, or community at large, and ''private'' as affecting or belonging to an individual person, company, or interest.

2. CONSTITUTIONAL LAW—STATUTES—CONSTRUCTION—POLICY.
     The Supreme Court has no power or authority to pass upon the wisdom, policy or equity of a statute.

3. STATUTES—UNAMBIGUOUS LANGUAGE LEAVES NO ROOM FOR INTERPRETATION.
     When the language of a statute is unambiguous, there is no room for interpretation.

4. SAME—LEGISLATIVE INTENT—TITLE OF ACT.
     The intention of the legislature governs the interpretation to be given a statute and such intention must be ascertained from the statute itself although in doubtful cases the title, no part of the statute, may be resorted to.

5. SAME—WORDS USED IN ORDINARY MEANING.
     Words of a statute are not ordinarily to be construed in a technical sense but as having been used in their ordinary meaning.

6. SAME—USE OF JUDICIALLY INTERPRETED LANGUAGE.
     The legislature is presumed to have used words which have been subject to judicial interpretation in the sense in which they have been interpreted.

7. SAME—INTERPRETATION TO BE REASONABLE.
     Statutes must be given a reasonable interpretation where possible and be so construed as not to lead to absurd consequences.

8. Same—Strict Construction When in Derogation of Common Law.

Statutes, especially those prescribing criminal offenses, in derogation of the common law are to be strictly construed.

9. Same—General Words—Ejusdem Generis.

General words used after specific terms are to be confined to things *ejusdem generis* with the things previously specified where no contrary intention appears.

10. Same—Restriction Upon Interpretation of General Words.

General words, in a statute defining a crime and regulating its punishment, are to be restrained to the matter with which the act is dealing and if it be specific things or particular modes only, the general words must be limited to such things or modes, except when it is apparent that the legislature intended by the general words to go further.

11. Food—Milk—Licenses—Sale to Public—Incidental Sale to Friends and Neighbors.

Statute requiring license of any person who shall sell or deliver milk or cream to a hotel, restaurant, boarding house or the public was not intended to abridge the right to contract with a few neighbors for a strictly incidental purpose such as sale of not more than six per cent. of milk produced to a dozen families of friends and neighbors who come to a person's farm for it and bring their own containers (1 Comp. Laws 1929, §§ 5316, 5321).

12. Same—Licenses—Sale of Milk—Capacity of Producer—Incidental Sale to Friends and Neighbors.

Sale of milk to public, as used within statute requiring license from commissioner of agriculture to do so and providing penalty for those who do not get such a license, covers sale to all those who have occasion to purchase within the limits of producer's capacity or ability to furnish it but not to a few friends and neighbors of milk producer, 94 per cent. of whose milk is sold to a creamery and two retail milk distributors (1 Comp. Laws 1929, §§ 5316, 5321).

Appeal from Kent; Brown (William B.), J.  Submitted June 17, 1937.  (Docket No. 117, Calendar No. 39,460.)  Decided June 29, 1937.

John Hughes Powell was convicted of selling milk to the public without a license contrary to 1 Comp. Laws 1929, § 5316.  Reversed.

*Eerde W. Hoogsteen,* for appellant.

*Raymond W. Starr,* Attorney General, *Fred N. Searl,* Prosecuting Attorney, and *Menso R. Bolt,* Assistant Prosecuting Attorney, for the people.

POTTER, J.  This case was tried in the circuit court upon an agreed statement of facts.  Defendant was found guilty of selling milk to the public within the meaning of 1 Comp. Laws 1929, § 5316, and appeals.

Defendant, a farmer and milk producer in Kent county, has about 20 quarts of milk above that which he sells to dealers and uses on the farm.  He was charged with delivering milk to the public without having obtained a license from the commissioner of agriculture.  Defendant keeps 50 cows on his farm and produces about 350 quarts of milk daily.  Most of it goes to the Blue Valley Creamery Company and to two retail milk distributors in Sparta.  The remainder, not to exceed 20 quarts a day, is sold to different individuals, personal friends and neighbors, who bring their own containers.  The sale of milk was confined to 12 families.

The only question is whether plaintiff is selling milk to the public in violation of the statute.  The people claim he is.  The trial court so held.  Defendant contends he is not selling milk to the public within the meaning of the statute.  This is the only question here.

Defendant's friends were not solicited to buy milk.  They get the milk by reason of their own request and intimate friendship with the defendant who does not

have a milk wagon, does not advertise, has no dairy lettering of any kind upon his delivery-pickup truck. They furnish and bring their own containers, either cans or regular milk bottles. Defendant's cattle are under Federal supervision, tested and inspected every 90 days, and are free from Bang's disease.

Section 5316, 1 Comp. Laws 1929, provides:

"Any person, firm, association, or corporation who shall sell milk, cream, goat's milk or other milk from a wagon or other conveyance, depot or store or who shall sell or deliver milk, cream, goat's milk or other milk *to a hotel, restaurant, boarding house or the public,* shall first obtain a license from the commissioner of agriculture to sell such milk or cream."

Section 5321, being a part of the same act, makes a violation of the provisions thereof a misdemeanor and prescribes the punishment therefor.

The words "public" and "private" are generally used in contradistinction to each other. "Private" is defined by Webster (New International, 2d Ed.) as "belonging to, or concerning, an individual person, company, or interest." "Public" is defined as "of or pertaining to the people; relating to, belonging to, or affecting, a nation, State, or community at large;—opposed to private." Bouvier (Rawle's 3d Rev.) defines "private" as "affecting or belonging to individuals, as distinct from the public generally;" and defines "public" as "the whole body politic, or all the citizens of the State. The inhabitants of a particular place."

Of the word "public," *Corpus Juris* says:

"In one sense, the 'public' is everybody; and accordingly 'public' has been defined or employed as meaning the body of the people at large; the community at large, without reference to the geograph-

ical limits of any corporation like a city, town, or county; the people; the whole body politic; the whole body politic, or all the citizens of the State.

"In another sense the word does not mean all the people, nor most of the people, nor very many of the people of a place, but so many of them as contradistinguishes them from a few. Accordingly, it has been defined or employed as meaning the inhabitants of a particular place; all the inhabitants of a particular place; the people of the neighborhood." 50 C. J. pp. 844, 845.

In the interpretation of a statute, this court has no power or authority to pass upon the wisdom, policy or equity thereof. When the language of a statute is unambiguous, there is no room for interpretation. The intention of the legislature governs, and this intention must be ascertained from the statute itself; though in doubtful cases, the title may be resorted to though it is no part of the statute. Words are not ordinarily to be construed in a technical sense but as having been used in their ordinary meaning. Where the language used has been subject to judicial interpretation, the legislature is presumed to have used particular words in the sense in which they have been interpreted. Where possible, statutes must be given a reasonable interpretation and be so construed as not to lead to absurd consequences. Statutes in derogation of the common law are to be strictly construed, and this rule is especially applicable to statutes prescribing criminal offenses. These principles are elementary.

The framers of the Constitution understood the difference between "public" and "private." Thus there are constitutional provisions relating to public accounts (Const. 1908, art. 10, § 18); public buildings (article 8, § 10); public contractors (article 16, § 3);

public health (article 5, §§ 1, 21); public peace (article 5, §§ 1, 21); public records (article 10, § 18); public safety (article 5, §§ 1, 21); public service (article 10, § 5); and public utilities (article 8, §§ 19, 25, 28, 29, 31). And constitutional provisions relating to private claims (article 5, § 34); private property (article 13, § 1); private purposes (article 5, § 24); and private roads (article 13, § 3).

Where no intention to the contrary appears, general words used after specific terms are to be confined to things *ejusdem generis* with the things previously specified. *American Transportation Co.* v. *Moore,* 5 Mich. 368; *Hawkins* v. *Railroad Co.,* 17 Mich. 56 (97 Am. Dec. 179).

When, after an enumeration, the statute employs some general term to embrace other cases, the other cases must be understood to be cases of the same general character, sort or kind with those named. *Brooks* v. *Cook,* 44 Mich. 617 (38 Am. Rep. 282); *State Prison Board of Control* v. *Auditor General,* 197 Mich. 377; *In re Estate of Ticknor,* 13 Mich. 44; *Board of Education* v. *City of Detroit,* 30 Mich. 505.

"It is a well settled general rule, and one especially applicable in the interpretation of statutes which define crimes and regulate their punishment, that general words are to be restrained to the matter with which the act is dealing, and that if it be dealing with specific things or particular modes only, the general words must be limited to such things or modes, except when it is apparent that the legislature intended by the general words to go further." *McDade* v. *People,* 29 Mich. 50.

In *Cawker* v. *Meyer,* 147 Wis. 320 (133 N. W. 157, 37 L. R. A. [N. S.] 510), plaintiffs were executors and trustees of an estate which owned a building de-

signed and intended to be rented for stores, offices and light manufacturing purposes. Plaintiffs installed a plant to furnish light, heat and electric energy, and upon its completion it was found the plant generated more energy than was demanded by plaintiff's tenants, and plaintiffs sold and furnished the surplus to other neighboring businesses. The railroad commission of Wisconsin claimed plaintiffs were engaged in the operation of a public utility and sought to regulate it; whereupon plaintiffs brought suit to enjoin the railroad commission from interfering with its business. The Wisconsin statute (Laws of 1907, Ch. 499) provided:

"The term 'public utility' as used in this act shall mean and embrace every corporation, company, individual, association of individuals, their lessees, trustees or receivers appointed by any court whatsoever, and every town, village or city that now or hereafter may own, operate, manage or control any plant or equipment or any part of a plant or equipment within the State, for the conveyance of telephone messages or for the production, transmission, delivery or furnishing of heat, light, water or power either directly or indirectly to *or for the public.*"

It was said:

"The State claims that by furnishing heat, light, and power to the tenants of their own building the plaintiffs became a public utility; that the furnishing of such commodities to any one else than to one's self is furnishing it to the public within the meaning of the statute. It is obvious that such a construction is too narrow, for it would constitute the owner of every building furnishing heat or light to tenants, as well as every householder who rents a heated or lighted room, a public utility. The legislature never contemplated such a construction to be given the words

'public utility.' They must receive a construction that will effectuate the evident intent of the legislature and not one that will lead to a manifest absurdity. It was not the furnishing of heat, light, or power to tenants or, incidentally, to a few neighbors that the legislature sought to regulate, but the furnishing of those commodities to the public, that is, to whoever might require the same. * * * If the product of the plant is intended for and open to the use of all the members of the public who may require it, to the extent of its capacity, the fact that only one or two thereof consume the entire product renders the plant nonetheless a public utility. On the other hand, a landlord may furnish it to a hundred tenants or, incidentally, to a few neighbors, without coming either under the letter or the intent of the law. In the instant case the purpose of the plant was to serve the tenants of the owners, a restricted class, standing in a certain contract relation with them, and not the public. The furnishing of power, light, and heat to a few neighbors was incidental merely and limited to them. * * *

"It is very difficult, if not impossible, to frame a definition for the word 'public' that is simpler or clearer than the word itself. The Century Dictionary defines it as 'of or belonging to the people at large, relating to or affecting the whole people of a State, nation or community, not limited or restricted to any particular class of the community.' The New International defines it as 'of or pertaining to the people; relating to or affecting a nation, State or community at large.' The tenants of a landlord are not the public, neither are a few of his neighbors or a few isolated individuals with whom he may choose to deal, though they are a part of the public. The word 'public' must be construed to mean more than a limited class defined by the relation of landlord and tenant, or by nearness of location, as neighbors, or more

than a few who by reason of any peculiar relation to the owner of the plant can be served by him."

The statute under which defendant was convicted, 1 Comp. Laws 1929, § 5316, requires a license of any person who shall sell or deliver milk or cream to a hotel, restaurant, boarding house or the public. The usual and ordinary construction of this language is that it applies to public businesses, places or institutions, to the public generally. The statute was not intended to abridge the right to contract with a few neighbors for a strictly incidental purpose. Each case must stand upon its own facts. If defendant should extend his business of selling to a substantial part of the people of the locality or to anyone who might desire or seek to purchase milk to the extent of his capacity or ability to furnish it, or make that his principal business, there is no question but that he might be liable under the statute. But the facts show defendant does not sell to the neighbors to exceed six per cent. of the total amount of milk produced by him. The statute covers selling the milk to the "public,"—that is, to all those who have occasion to purchase, within the limits of the defendant's capacity or ability to furnish it. See 6 Words & Phrases (1st Series), pp. 5771–5841; 4 Words & Phrases (2d Series), pp. 1–53. I think this statute was not intended to be so construed as to compel every farmer who sells a pint of milk to his neighbor to take out a license and be placed under public regulation.

Conviction reversed and defendant discharged.

FEAD, C. J., and NORTH, WIEST, BUTZEL, BUSHNELL, SHARPE, and CHANDLER, JJ., concurred.