## DODGE v. BLOOD.

1. SPECIFIC PERFORMANCE—CONTRACTS—BURDEN OF PROOF.
   A plaintiff seeking the specific performance of a contract for the sale of corporate stock has the burden of proving all the elements necessary to establish a contract.

2. CONTRACTS—MEETING OF MINDS UPON ESSENTIAL POINTS.
   A meeting of the minds upon all essential points is necessary to constitute a valid contract.

3. SPECIFIC PERFORMANCE—CONTRACT FOR SALE OF CORPORATE STOCK —FINDING OF FACT BY TRIAL COURT.
   In suit for specific performance of alleged contract for the sale of corporate stock wherein testimony was in direct conflict as to whether plaintiff's agent had said he would confirm the *offer* or would confirm the *sale* the next day, trial court's finding of fact that plaintiff had failed to prove a meeting of the minds would not be reversed since it is supported by competent evidence.

4. APPEAL AND ERROR—DE NOVO HEARING OF CHANCERY CASES.
   The Supreme Court hears chancery cases *de novo* and should weigh all the evidence and reach an independent conclusion.

Meeting of minds, see 1 Restatement, Contracts, §§ 20, 22.

5. Same—Findings of Fact—Observation of Witnesses.
    In chancery cases the trial court's finding on disputed questions
    of fact is not controlling although it is recognized that the
    trial court has an advantage in making personal observation
    of the conduct of the witnesses.

6. Same—Chancery Cases—Reversal of Decrees.
    The Supreme Court does not reverse decrees in chancery cases
    unless persuaded they are not in accordance with the just
    rights of the parties.

Appeal from Wayne; Richter (Theodore J.), J. Submitted October 7, 1943. (Docket No. 51, Calendar No. 42,495.) Decided November 29, 1943. Rehearing denied January 13, 1944.

Bill by C. Gerard Dodge against Howard E. Blood to compel specific performance of a contract for the sale of corporate stock. Decree for defendant. Plaintiff appeals. Affirmed.

*Miller, Canfield, Paddock & Stone,* for plaintiff.

*Leo W. Kuhn,* for defendant.

Sharpe, J. This is a suit to compel specific performance of a contract to sell corporate stock.

The subject of this controversy has been before this court on prior occasions. In *Dodge* v. *Blood,* 299 Mich. 364 (138 A. L. R. 322), defendant's motion to dismiss on the ground of noncompliance with the statute of frauds* was granted and plaintiff appealed. The order of the trial court was reversed and the cause remanded for further proceedings. In *Dodge* v. *Blood,* 305 Mich. 443, the trial court held that the proper venue for the cause was not in Wayne county. The decree of the trial court was vacated and the cause remanded to the circuit court of Wayne county for trial.

The issue now before us is different than in either of the above appeals. The stock involved is a part

* See 2 Comp. Laws 1929, § 9443 (Stat. Ann. § 19.244).—Reporter.

of the capital stock of S. A. Woods Machine Company, a Massachusetts corporation. At one time all the outstanding shares of stock of this corporation were divided equally between Harry C. Dodge, plaintiff's brother, and Charles Blood, defendant's uncle. Charles Blood died; and when his estate was distributed in 1939, defendant, Howard E. Blood, received 53 shares. A few months later, upon the death of another relative, he inherited an additional 10 shares.

At this time, Harry C. Dodge was the owner of 859 shares of stock in the corporation, which represented 43 per cent. of the 1,978 shares outstanding. He was anxious to get the controlling interest in the corporation and wrote to several of the heirs of Charles Blood in an effort to buy their shares, but met with no success. He then interested his brother C. Gerard Dodge, plaintiff herein, in purchasing some of the outstanding shares of stock. Plaintiff lives in New York city. On October 15, 1940, he employed the First of Michigan Corporation, through Mr. Hoysradt of its New York office, to approach the defendant in Detroit. Mr. Hoysradt called the Detroit office of the First of Michigan Corporation and instructed Mr. Zuber to offer defendant $95 per share. Zuber made the offer, but defendant declined to sell. The following day, Zuber wired Hoysradt that: "Blood will not change his idea of price." Hoysradt replied "105 good through day is his final limit." Zuber did not plan to see defendant until after the market closed at 3 p.m. About 4 p.m., Zuber went in person to defendant's office and told him that he (Zuber) was authorized to make a final offer of $105 per share. The only witnesses who testified as to what was said at this meeting were Mr. Zuber and Mr. Blood.

Zuber's version as to what was said may be gleaned from his testimony.

"I said, 'All right, if you want to sell it, we will buy it, and—as agent for our undisclosed principal in New York.' And I glanced at my watch and saw that it was around 4:20, and our wire goes down at 5, and it is usual procedure—we consider all contracts on day orders closed at 5, unless otherwise specified, and I excused myself and went back to our office and sent the wire.     *     *     *

"Q. You say that Mr. Blood told you that after checking the fact that he had 63 shares, that he might as well sell it?

"A. That is right.

"Q. And your reply to that was, 'Well, if you want to sell it, we have bought at 105'?

"A. I might inject there that I told him that the usual procedure was to send a written confirmation —which he would receive the next morning, which we sent out that night yet.     *     *     *

"Q. Did Mr. Blood say anything further about wanting to sell or not wanting to sell, after you had stated that you had bought the stock?

"A. No.     *     *     *

"Q. Did you tell Mr. Blood you would send him confirmation by mail in the morning?

"A. Yes.     *     *     *

"Q. What did you say to Mr. Blood about confirming the sale to New York?

"A. Just what I said before, that I realized the lateness of the afternoon, and the necessity of getting back to confirm the stock to New York, so they might in turn confirm the purchase to their principal.

"Q. Did Mr. Blood request you not to confirm to New York?

"A. No.     *     *     *

"Q. Now, you were very much in a hurry on the 16th, when you talked to Mr. Blood, right?

"A. Well, no more so than I—

"Q. You didn't get out there until about 4, and your wires closed at—

"*A.* I don't know what time I got there.

"*Q.* It was after the market?

"*A.* I know it was about 4:20, or right around 4:20, 4:25, because I had to allow myself time to get back to the office, write a wire, and get it through the wire to our New York office.

"*Q.* Your wire closed at 5?

"*A.* Yes.

"*Q.* And you think it was about 4:20?

"*A.* I think so, approximately.

"*Q.* You were in a hurry to get back and send a wire?

"*A.* Well, I wanted to give myself enough time to get there, yes.

"*Q.* And when you left Mr. Blood, he said, 'I guess maybe I will sell'?

"*A.* I don't know his exact—

"*Q.* What is that?

"*A.* I don't know if that is the exact words he said. He said something to that effect.

"*Q.* Something to that effect, 'I guess maybe I will sell'?

"*A.* I don't know exactly how he said it.

"*Q.* You were in a hurry, and you told him you would confirm it to him tomorrow?

"*A.* No, I didn't say that. I said, If that is agreeable, I will buy the stock. He said, All right.

\*    \*    \*

"*Q.* In other words, if he made up his mind to sell, you would buy it, and you would confirm the offer the next day?

"*A.* That is as I understood it.

"*Q.* What is that?

"*A.* He said all right, I said all right, and it was agreed. I said, 'I will send you a confirmation in tonight's mail, which you will get tomorrow, confirming the contract.'

"*Q.* Confirming the offer?

"*A.* No; confirming the contract."

Defendant testified as follows:

"*Q.* Will you relate the conversation as best you can, just what he said and what you said?

"*A.* He told me that his office had an inquiry from someone for the purchase of this stock, and wanted to know if I would be interested to sell it at a price of $95 per share, and—it seems to me, though, that he had told me that on the telephone before he came over to see me, and that I had expressed no interest whatever in that figure, and he had asked me at that time for some figure, and I hardly knew what to say, but I said that possibly I might be interested at $125 a share, as I recall it.

"As I remember it, there was some telephone conversation to that effect prior to the time that he came over to see me, and that when he did come, he told me that he had an offer, could make me an offer, at $105 a share. That was the last word. Was I interested or was I not? I told him that I guessed maybe I had better sell it at that price.

"He seemed to be in a hurry to get back to the office, and said, 'All right. I will confirm that offer to you in the morning,' and he left.

"That is the substance of the conversation as I recall it.

"*Q.* You say he said he would confirm the offer to you the following morning?

"*A.* Yes.

"*Q.* He testified this morning that he said he would confirm the sale. Which, to the best of your knowledge, is what he said?

"*A.* I have a very distinct recollection that he said he would confirm the offer, because in my own mind I didn't consider that I had made a sale. If he had said sale, I think I would have discussed the point with him at the time. To me, what he said meant that he had an offer that had to be confirmed in the morning and the deal would be closed, if at all.

"*Q.* And he hurriedly left your office.
"*A.* Yes."

After leaving defendant's office, Zuber returned
to his own office and wired Hoysradt that he had
bought the stock. Later in the day, Zuber mailed
defendant a written confirmation of the purchase as
agent for an undisclosed principal. On October 17,
1940, the day following the disputed conversation,
defendant called Zuber to cancel the transaction,
stating that he had decided not to sell because he
was afraid it might prejudice the position of a
relative with the company.

The trial court dismissed plaintiff's bill of com-
plaint and in a written opinion stated:

"The court has heard the testimony of these
witnesses and finds nothing to discredit the testi-
mony of either and believes that each witness testi-
fied as he remembered the transaction. In this state
of the testimony, the Court can only find that there
was a misunderstanding between the parties. If
there was a misunderstanding, there was no agree-
ment. If there was no agreement, then there was no
contract.

"The plaintiff, having the burden of proof, must
establish that the minds of the parties met and that
there was an agreement to sell the stock. This the
plaintiff has failed to do and the court, therefore,
finds that there was no contract."

Plaintiff appeals and contends that the evidence
produced upon the trial established a contract to
sell the shares of stock; that First of Michigan
Corporation, as a broker, was the agent of the de-
fendant and had authority to execute a memorandum
in writing of the sale; and that plaintiff is entitled
to specific performance of the agreement to sell.

Plaintiff seeking specific performance of the con-
tract has the burden of proving all the elements to

establish a contract. It is elementary that "a meeting of the minds upon all essential points is necessary to constitute a valid contract." See *W. C. Sterling & Son Co.* v. *Watson & Bennett Co.*, 193 Mich. 11. In our examination of the record we are convinced that Zuber was anxious to complete the bargain and in his haste assumed that defendant's comment, "Well, I might as well sell it," constituted a positive affirmance of the sale. Having in mind defendant's refusal to sell this same stock prior to such statement being made, we are not convinced that there was an unqualified acceptance of plaintiff's offer and are inclined to rely upon the finding of facts by the trial judge.

In the case at bar there is competent evidence to support the finding of facts of the trial judge. The rule stated in *Re George L. Nadell & Co., Inc.*, 294 Mich. 150, applies to the situation in the case at bar. We there said:

"We hear chancery cases *de novo*. *Petz* v. *Gaines*, 286 Mich. 450. It is our duty to weigh all the evidence and to reach an independent conclusion. *Hawthorne* v. *Dunn*, 210 Mich. 176. We recognize that in disputed questions of fact, the trial court has an advantage in being able to observe personally the conduct of the witnesses. Such observations are oftentimes of value in giving some weight to the findings of the trial court, *Metropolitan Life Ins. Co.* v. *Stewart*, 280 Mich. 24, but in such cases the finding of facts by the lower court is not controlling. *Snider* v. *Schaffer*, 276 Mich. 92.

"In *Langdell* v. *Langdell*, 285 Mich. 268, we said:

" 'We hear chancery cases *de novo*; but we do not, and should not, reverse decrees unless we are persuaded they are not in accordance with the just rights of the parties.'

"In the case at bar, there was competent testimony to support the finding of the trial judge and

we cannot upon this question of fact hold that the weight of evidence is contrary to the court's finding."

In view of our determination on this issue it becomes unnecessary to discuss other questions raised. The decree of the trial court is affirmed, with costs.

Boyles, C. J., and Chandler, North, Starr, Wiest, Butzel, and Bushnell, JJ., concurred.