**SOCONY–VACUUM OIL CO., Inc. v. TEXAS CO. et al.**

No. 1156.

United States District Court
E. D. Michigan, N. D.

July 1, 1953.

Goggin & Baker, Alma, Mich., Beaumount, Smith & Harris, Detroit, Mich., for plaintiff.

Uhl, Bryant, Slawson & Wheeler, Grand Rapids, Mich., for defendants Texas Co., Shell and Derry.

Alfred J. Fortino, St. Louis, Mich., for defendants Martin and Mary Nemeth.

PICARD, District Judge.

This is an action for the possession of certain lands.

### Findings of Fact

In 1944, Martin Nemeth, individually, d/b/a Nemeth Oil Co., in St. Louis, Michigan, entered into an agreement with defendant, Texas Company, for distribution of Texas petroleum products.

In 1945, Martin and Mary Nemeth, his wife, on the advice of auditors and for income tax purposes, filed a certificate of co-partnership, d/b/a Nemeth Oil Co. Apparently the wife made no payment for her interest.

In 1948, defendant Texas Company entered into a new distributorship agreement with "Nemeth Oil Co." Though not designated as a partnership the agreement was signed by both Mary and Martin Nemeth and contained the following option:

"In consideration of the premises, if at any time during the term of this agreement, or any extension or renewal thereof, Purchaser[1] shall receive *a bona fide offer to purchase, lease, or sublease all or any part of the land, buildings, structures, improvements, equipment, facilities, leaseholds, assets or other interest in land owned or used by Purchaser in his business of storing, handling, selling and distributing petroleum products,* hereinafter referred to as 'property', which offer Purchaser shall desire to accept, Purchaser shall immediately give Seller[2] written notice by registered mail of the receipt of such offer, the complete terms thereof, together with a true copy of the offer, and a statement of Purchaser's desire to accept the same, and Seller shall have thirty (30) days after the receipt of such notice in which to elect to purchase, lease, or sublease said property, as the case may be, upon the same terms and conditions as those contained in such offer. During said thirty (30) day period Purchaser shall furnish Seller complete information in respect of the property involved in such offer and give Seller complete access to all of Purchaser's books and records in respect of said property." (Emphasis ours.)

Sometime after this agreement was made the Nemeths bought the premises in suit out of partnership funds but took title in Martin's name alone with the check in payment thereof drawn on Nemeth Oil Co. and signed by Mary Nemeth. Thereafter, in 1949, a large service station and a bulk plant were constructed thereon with partnership funds. Throughout 1949, 1950, and 1951 the relationship between the Nemeths and defendant Texas Company remained the same.

In October, 1951, plaintiff, Socony-Vacuum Oil Co., became interested in the service station, but was advised by Nemeth that Texas had preemptive rights in the premises. A week later, Socony re-visited Nemeth and "discovered" that title to the realty was not in the partnership but in Martin Nemeth individually.

On November 9, 1951, Socony, seizing upon this technicality, again came to the Nemeths in St. Louis and this time brought along a lease and supplemental agreement which it had prepared. The lease provided that it should become valid if and when

---

1. Purchaser—the Nemeths.

2. Seller—Texas Co.

executed by Socony before January 1, 1952, while the supplemental agreement provided that the purchase of the bulk plant, trucking, and consumers' equipment was to be subject to the preemptive rights of Texas. Both Nemeths signed these agreements. The Nemeths claim, however, that they signed only after informing plaintiff that they believed Texas had preemptive rights in the land as well as in the equipment. On the other hand Socony claims that its lease was subject only to the approval of its executives; that it was not conditioned on the preemptive rights of Texas, that in fact Texas had no preemptive rights in the realty, and that the Nemeths knew Texas had no such rights.

Within a day or so, Nemeth informed defendant Texas Company that Socony had made him an offer, and on November 19, 1951, went to Chicago where he and the Texas Company discussed meeting the offer made by Socony. At that time Texas again made strong claims that it had preemptive rights in both realty and personal property.

On November 23, 1951, Nemeth sent Texas a written notice of Socony's offer allegedly as provided in the 1948 agreement.

On November 26, 1951, Nemeth signed and delivered to Texas the lease under which defendant Texas is now in possession. Texas then learned for the first time that Nemeth had actually signed a lease with Socony, but was informed by Nemeth that Socony's lease was given subject to Texas' preemptive rights.

Shortly thereafter on November 30, 1951, Nemeth called Socony and advised it that Texas was exercising its preemptive rights.

On December 5, 1951, Texas demanded from Nemeth a more adequate notice of Socony's offer but did not receive it.

On the same day, Socony wired Texas and Nemeth that it had made a lease with Nemeth and that all other transactions were to be subject thereto. Then, without waiting for authority from its headquarters, Socony's Detroit office, on December 11th, delivered its signed lease and check for the first month's rental to Nemeth by a stranger who handed the envelope to Nemeth and left immediately. Nemeth threw the envelope on the desk, later opened it, and immediately returned check and lease to plaintiff with a letter stating that Texas had exercised its preemptive rights.

Texas signed its lease December 31, 1951, and took possession January 1, 1952.

Texas claims that Nemeth told it that Socony had offered $20,000 for the equipment, whereas Socony had only offered $17,317. In any event the final Texas agreement provided $17,317 for the equipment which Texas states was indirectly increased to $20,000 by omitting some equipment which Nemeth said he could sell for $2700.00, a lease for ten years at $325 a month rental and two five-year options. Socony was offered a ten-year lease with only one five-year option. The rental per month was the same.

The court also finds that:

1. Martin Nemeth and his wife, were desirous of getting out of both the retail and wholesale oil and gas business, a fact well known to both plaintiff, Socony-Vacuum, and defendant Texas.

2. When plaintiff "discovered" that the real estate was in the name of Martin Nemeth alone and not of the partnership, the possibility that defendant Texas Company did not have any preemptive rights therein was suggested to the Nemeths. This opened an avenue for bargaining that had not appealed to any of the parties up to that time.

3. The lease given plaintiff by Nemeth was contingent upon the happening of two events:

(a) Acceptance by plaintiff through its head office, and

(b) The assurance by the Nemeths that the bulk plant, service station, equipment, and land was all one deal and that if in the meantime the Texas Company exercised its preemptive rights, the agreement with plaintiff was for naught.

4. Plaintiff was not, and is not, a good-faith purchaser, particularly since the germ of the legality of Nemeth's disregard for Texas Company's rights was undoubtedly planted by plaintiff.

5. The difference between provisions of the option that Texas Company had and the

final contract between the Nemeths and the Texas Company is so immaterial as to be of no consequence, but, if material, it is either the result of plaintiff's own act in not acquainting Texas Company of what its agreement with Nemeth was, since it knew the terms of the option Texas had with the Nemeths, or because the Nemeths were reticent to let Texas Company know at that time the extent of their arrangement with plaintiff.

## Conclusions of Law

■ There are two avenues of approach on the questions of law before us, depending upon whether a partnership between a husband and wife alone is legal in Michigan. Assuming that such entity is legal and that the legal title here is in the name of the husband, then by the Michigan Supreme Court's rulings a suit in ejectment by owner of the title cannot be defeated by one who advances a purely equitable defense. Moran v. Moran, 106 Mich. 8, 63 N.W. 989; Olmstead v. Johnson, 313 Mich. 57, 20 N.W.2d 809; Lundberg v. Wolbrink, 331 Mich. 596, 50 N.W.2d 168.

■ But the new Federal rules are broad and very liberal and will permit equitable defenses to be advanced so that "all relief" may "be secured." Moore's Federal Practice, Vol. I, 2.04; Jacobson v. Coon, 6 Cir., 165 F.2d 565; Prudential Insurance Co. of Am. v. Strickland, 6 Cir., 187 F.2d 67.

Furthermore, because one initiates an action and calls it a suit in ejectment does not necessarily make it so. There are other issues that may be considered and in this particular case those issues may overshadow, and we believe do, the ejectment feature of this suit. This, in the federal court, is a civil action. See Rule 2 and Rule 8 (e)(2) Federal Rules of Civil Procedure, 28 U.S.C.A.

■ And there are many facts involved here that raise a doubt in our mind as to whether this is strictly an ejectment suit where all equities should be disregarded before the title itself can be questioned. In fact, this court holds that the legal title is not in plaintiff. As laid down in Malone v. Kugel, 281 Mich. 351, 275 N.W. 169; White Showers, Inc. v. Fischer, 278 Mich.

32, 270 N.W. 205; and Kachanowski v. Cohen, 305 Mich. 438, 9 N.W.2d 667, where a lease or a deed is delivered upon condition or the happening of some contingency it may be shown that such condition or contingency never came into existence. In our opinion the Nemeths merely made an offer to plaintiff which plaintiff was not bound to accept. Incidentally, plaintiff made certain that it had a lot of time before it would be bound depending upon what Texas Company did and had it not been for the telephone conversation of November 30th which we also find to be a fact, plaintiff might never have made any attempt to go through with its deal and would have undoubtedly given as a reason that its superiors did not approve of the same. While the oil companies seemingly tried to out-maneuver each other, if there was any out-maneuvering, it was done by the Nemeths and, of course, plaintiff cannot now complain that its tactics were not successful because while the deal was hanging in the balance Texas Company moved to a conclusion.

We are impressed also with the fact that plaintiff is not an innocent purchaser. It gave nothing for its alleged lease and played safe all the time knowing that Texas might not be ready to pursue its rights. It has therefore not been placed at a disadvantage. 55 Am.Jur. 747, pp. 1108–9; Wiles v. Shaffer, 175 Mich. 704, 141 N.W. 599; Dixon v. Hill, 5 Mich. 404.

We also cite in addition the following conclusions of law on the rights of the parties.

Plaintiff claims that it made a contract with the Nemeths that had priority over that between the Nemeths and Texas Company. The evidence is conclusive that the Nemeths were getting out of the oil business entirely—not partly—and while under the contract plaintiff was obliged to purchase the personal property it would do so only if its head office authorized lease of the realty. But the Nemeths were not cutting off all contacts with Texas Company and they knew that Texas would have no use for the personal property if it didn't have the realty. As found above, plaintiff knew this because plaintiff had the same thought. We believe that plaintiff was

aware that the Nemeths were not completely severing connections with defendant Texas and that if Texas did exercise its preemptive rights then plaintiff's control over the real estate was tenuous. If plaintiff so understood the deal then the Nemeth-Texas contract was valid. If plaintiff did not so understand then there was no meeting of the minds between plaintiff and the Nemeths. In either event plaintiff had no contract. Dodge v. Blood, 307 Mich. 169, 11 N.W.2d 846; Fisk v. Fisk, 328 Mich. 570, 44 N.W.2d 184.

Likewise, the evidence is conclusive that both plaintiff and the Nemeths understood that neither the Saginaw nor Detroit office had authority to bind Socony; that the contract had to be sent to its main office and plaintiff would have until the end of December to secure such approval. But suddenly, when it learned that defendant Texas Company had made its deal with Nemeths, plaintiff's Detroit office discovered that it had had such authority all the time. So the Detroit office signed the lease on December 8th or 9th—long before its own deadline.

We can only conclude that it hoped by so doing to induce Texas to withdraw from the competition for to this very day there is no evidence that the proper officials of Socony ever gave anyone any authority to sign this lease. In view of the fact that Nemeths knew such authority must be secured, might they not have been estopped from claiming that it had any lease with plaintiff if plaintiff had refused to continue even after plaintiff had paid one month's rent? At least the Nemeths might have been in for some additional trouble.

### Husband and Wife as Partners

In the state of Michigan, prior to 1941, husband and wife could not be partners, but in 1941 the following act was passed:

"A partnership is an association of 2 or more persons, which may include husband and wife, to carry on as co-owners a business for profit; * * *." Uniform Partnership Act, M.S.A. § 20.6. Comp.Laws 1948, § 449.6.

Just what that means has not been interpreted by the Michigan courts. In Lo-

bato v. Paulino, 304 Mich. 668, 8 N.W.2d 873, it was recognized that husband and wife could be in a partnership, that is, as part of the partnership, but in that case there was still a third partner in addition to the husband and wife.

■ It is an accepted rule of construction, that the words of a statute are to be given their plain and ordinary meaning, for it is presumed that the legislature, not having indicated otherwise, so intended. People v. Powell, 280 Mich. 699, 274 N.W. 372, 111 A.L.R. 721; Boyer-Campbell Co. v. Fry, 271 Mich. 282, 260 N.W. 165, 98 A.L.R. 827.

The key words of the amendment are "which" and "include."

The antecedent of the relative pronoun "which", we submit, may as well be "association" as "persons" inasmuch as the pronoun "which", in modern usage usually and technically refers only to animals or inanimate objects and not persons. Webster's New International Dictionary, Second Edition, G. & C. Merriam Co., Publishers (1939).

"To include is to comprehend, esp. as a constituent or subordinate element of a whole, or as a part in a total." Webster's New International Dictionary, supra.

■ Thus we have "an association * * * which may include husband and wife." Husband and wife together are here regarded as an element of a whole. That is, it would have been meaningless for the legislature to have amended this act for the purpose of simply permitting "either a husband or a wife" to enter into a contract of partnership with some third person, as that was already sanctioned by the law. But before this law a "husband and wife" could not be in a partnership together even where there were other persons. Farmers' Co-operative Creamery Co. v. Huhn, 241 Mich. 23, 216 N.W. 370. Therefore we conclude that it was the intention of the legislature that a husband and wife together may be included in a partnership association. If the legislature intended something more than this, it would have used the word "consist", "composed", "made

up of", "comprised", or any number of other words, instead of "include", which would have readily conveyed the meaning that the partnership as a whole could consist of a husband and wife alone.

It is a well-settled rule of construction that statutes in derogation of the common law are to be strictly construed. The act defines a partnership; it does not define the general capacity of persons to enter into a contract of partnership. The capacity of a married woman to contract has always been defined by the provisions of the Married Women's Act and under those provisions a married woman in Michigan has never had the capacity to contract a partnership alone with her husband.

So it must be apparent that if the partnership was a myth or an illegal entity that when the partnership gave preemptive rights to Texas Company it included the property which Nemeth later took in his own name.

For the various reasons given we hold that the plaintiff may not prevail and a judgment in accordance with this opinion may be submitted to this court for its signature.