OPINION OF THE COURT
Meyer, J.
A statute which requires a landlord to allow installa *131 tion of cable television[1] facilities upon his property for the use of his tenants or the tenants of other buildings or both is a valid exercise of the police power rather than a taking requiring compensation, notwithstanding that the statute permits the payment by the cable television company for such installation of such amount as the State Commission on Cable Television[2] determines to be reasonable. The order of the Appellate Division should, therefore, be affirmed, with costs.
Plaintiff Loretto purchased the five-story apartment building known as 303 West 105th Street in New York City from Sharie Wald, taking title to the premises on February 28, 1972. In February, 1976, plaintiff began this class action against TelePrompter Corporation and TelePrompter Manhattan CATV Corp.[3] on behalf of a class consisting of all owners of real property in the State of New York on which TelePrompter “has placed any cable television component.” As to her own property plaintiff alleged that TelePrompter had placed a CATV cable on the roof of the premises, attaching it by nails and other means, and had dropped a subcable down the front wall of the building to provide service to a first floor tenant. She asked for herself and each member of the class damages for the trespass and an injunction against its continuance. She specifically alleged that TelePrompter acted under the purported authority of section 828 of the Executive Law[4] and that its actions *132 constituted a taking without just compensation and a deprivation of property without due process of law.
Class action status was granted by an order which, as amended, constituted the class as plaintiff had requested but except from it owners of single family dwellings on which a CATV component servicing that dwelling exclusivély had been placed.[5] The City of New York as franchisor of cable television companies within the city was granted leave to intervene and the Attorney-General, pursuant to section 71 of the Executive Law, appears in the action in support of constitutionality. During the examination before trial of plaintiff Loretto it appeared that she had in late 1976 or early 1977 transferred the property to Hargate Realty Corporation, a corporation wholly owned by her. The answers of both TelePrompter and the city raised the affirmative defense that plaintiff had failed to exhaust her administrative remedies in that she had not applied to the Commission under regulations adopted by it (9 NYCRR 598.2) for the fixation of a reasonable fee in excess of the one-time $1 payment fixed by the Commission in a statement of general policy as the normal fee to which landlord would generally be entitled.
TelePrompter moved for summary judgment dismissing the complaint, asserting that it had committed no trespass and that plaintiff had failed to exhaust her administrative remedies. The assertion that it had committed no trespass was grounded on both the legal argument that section 828 *133 of the Executive Law is a valid exercise of the police power making permission unnecessary, and the factual contention that plaintiff Loretto’s predecessor in title, Sharie Wald, had granted it an easement for installation of its facilities. TelePrompter also sought leave to renew its opposition to the class action determination. Plaintiff cross-moved for partial summary judgment determining that section 828 is unconstitutional, that it did not in any event include crossover situations,[6] and that TelePrompter was liable for trespass in noncrossover situations to damages of 5% of defendant’s gross revenues from their premises. Prompted by the transfer of 303 West 105th Street to Hargate Realty, plaintiff Loretto also sought an order amending the class action order to include all persons who have or had title to affected premises at any time on or since January 1, 1973, the effective date of section 828. Neilson Abeel, owner of 320 West 104th Street, on which TelePrompter had installed cable to service his tenants as well as those in neighboring buildings, moved at the same time (acting through the same attorney representing plaintiff) for leave to intervene on the ground that plaintiff Loretto’s representation of the class might be inadequate.
Concluding that “the obvious public advantage sought to be served by the legislation under attack greatly outweighs the insignificant nature of the physical use of private property permitted by the statute” (98 Misc 2d 944, 945), Special Term granted summary judgment to TelePrompter and the city declaring section 828 to be a valid exercise of the police power in both crossover and noncrossover situations, denied plaintiff Loretto’s cross motion for partial summary judgment and denied as moot TelePrompter’s motion to renew opposition to class action status, plaintiff Loretto’s motion to amend the class action order to include former *134 owners and proposed intervenor Abeel’s motion for leave to intervene. The Appellate Division affirmed, without opinion.
Plaintiff and the proposed intervenor appealed to our court.[7] The briefs and oral argument present as issues for determination the standing of plaintiff Loretto to maintain the action; whether if she is without standing proposed intervenor Abeel may prosecute the appeal; whether the action is premature; whether section 828 addresses both crossover and noncrossover situations; the constitutionality of the section; and if it is not constitutional whether class members are each entitled to damages in non-crossover situations of 5 % of TelePrompter’s gross revenue from the member’s building. For the reasons hereafter stated we conclude that (1) plaintiff Loretto has standing to litigate the scope and constitutionality of section 828, (2) the action is not premature, (3) section 828 covers crossovers as well as noncrossovers and (4) the section is a valid exercise of the police power. In light of those conclusions, we need not consider the intervention and damage issues.
I
By agreement dated January 24, 1968, Sharie Wald, the then owner of 303 West 105th Street, for a flat fee of $50, granted TelePrompter permission to install a cable on the building and the exclusive privilege of furnishing CATV services to its occupants. The agreement was for a term of five years and from year to year thereafter unless either party gave the other written notice no later than 90 days prior to the end of a contract year. It also required Wald upon transfer of the building to notify the transferee of *135 the agreement and provided for termination by the transferee at any time within six months after the transfer, upon 90 days written notice to TelePrompter.
On June 1, 1970 TelePrompter installed a cable slightly less than one-half inch in diameter and of approximately 30 feet in length along the length of the building about 18 inches above the roof top, and directional taps, approximately 4 inches by 4 inches by 4 inches, on the front and rear of the roof. By June 8, 1970 the cable had been extended another 4 to 6 feet and cable had been run from the directional taps to the adjoining building at 305 West 105th Street. Plaintiff Loretto testified at her deposition that she purchased the building in 1971 and took title on February 28, 1972, that she was on the roof to inspect it prior to the closing of title and a number of times after the closing while a new roof was being installed, but that she never saw the cables until CATV service was provided to one of her tenants about two years after her purchase.
The Wald agreement was unrecorded and, therefore, would not bind plaintiff Loretto unless the installation was sufficiently open and visible to put her to inquiry and charge her with constructive notice of the agreement that inquiry would have revealed (Pallone v New York Tele. Co., 34 AD2d 1091, affd 30 NY2d 865; Historic Estates v United Paper Bd. Co., 260 App Div 344, affd 285 NY 658; see Butterworth v Crawford, 46 NY 349; 17 NY Jur, Easements & Licenses, § 187, p 482; Ann., 74 ALR 1250). Transfer to plaintiff Loretto would, however, terminate the license, even though TelePrompter had no notice of the transfer (Restatement, Torts 2d, § 171, Comment f), unless Loretto had (or was chargeable with) notice and took no steps to terminate the license (id., Comment g). The factual isues concerning visibility of the TelePrompter equipment and whether the transfer to Loretto (or her bringing of the present action) terminated the Wald agreement bear upon whether Loretto can recover for trespass occurring before the action was begun, but do not affect her right to maintain the cause of action for declaratory judgment concerning the scope, of and constitutionality of section 828, for that section, if applicable and valid, pre *136 vented her interference with the CATV facilities on her premises from and after the effective date (January 1, 1973) of the section. That she had notice of the Wald agreement, if she did, would not prevent her termination of it, if the statute did not. That she was not bound by the Wald agreement would not permit her to recover in trespass on the ground that the transfer to her terminated the license, if TelePrompter obtained a similar license through enactment of the statute. There was, therefore, a justiciable controversy which plaintiff Loretto had standing to maintain (cf. Berenson v Town of New Castle, 38 NY2d 102, 107, n 1; Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, 366, app dsmd 409 US 1003; see, also, Andrus v Allard, 444 US 51, 64, n 21).
Nor did her transfer of the premises to Hargate cause the action to abate. Not only was she as the sole stockholder of the corporation the real party in interest, but also the transfer occurred after the action was brought. CPLR 1018 expressly provides that “Upon any transfer of interest, the action may be continued by or against the original parties unless the court directs the person to whom the interest is transferred to be substituted or joined in the action,” and was applied in Udell v Haas (20 NY2d 862) to just such a situation as the present. In light of the express legislative policy against abatement of actions (2 Weinstein-Korn-Miller, NY Civ Prac, par 1023.03) and the procedural flexibility intentionally built into the CPLR’s class action provisions (see CPLR 907; 2 Weinstein-Korn-Miller, op. cit., par 907.07), we have no hesitancy in holding that plaintiff Loretto may continue the action notwithstanding the transfer to Hargate.[8]
II
Defendants point to the provision of section 828 (subd 1, par b) prohibiting a landlord from demanding or accepting payment from any cable television company in exchange *137 for permitting cable television service “in excess of any amount which the commission shall, by regulation, determine to be reasonable” and to the provisions of Part 598 of the Commission’s Rules and Regulations which authorize an application to the Commission for the fixation of a fee in excess of the $1 fee which by its statement of general policy the Commission has stated is the nominal fee to which, generally, a landlord will be entitled, and argue that no action will lie until application has first been made to the Commission for the fixation of a fee.[9]
The argument might have validity were section 828 (subd 1, par b) a clear joint exercise of the power of eminent domain and the police power, for then the provision for compensation under the eminent domain power might moot any question of the reasonableness of the exercise of the police power (compare Matter of Kansas City v Liebi, 298 Mo 569, and Pera v Village of Shorewood, 176 Wis 261, with City of Kansas City v Kindle, 446 SW2d 807 [Mo]; and see Bosselman, Callies & Banta, The Taking Issue, pp 302; and Ann., 41 ALR3d 636). Not every exercise of the police power that includes a provision relating to compensation is an exercise of the power of eminent domain, however, or constitutes a taking (see French Investing Co. v City of New York, 39 NY2d 587, app dsmd and cert den 429 US 990).
CATV companies such as TelePrompter are incorporated under the Transportation Corporations Law (see Hoffman v Capitol Cablevision Systems, 82 Misc 2d 986, affd 52 AD2d 313; Harper v City of Kingston, 17 Misc 2d 627; 1952 Opns Atty Gen 166), and section 27 of that law includes express provision for compensation “ascertained in the manner provided in the eminent domain procedure law” when lines are run upon, through or over privately owned *138 land. The fact that section 828 (subd 1, par b) of the Executive Law makes no reference to the Transportation Corporations Law provision and, more importantly, the fact that the subdivision imposes an upper limit upon the amount that may be demanded or accepted by a landlord from a cable television company rather than a requirement that such a company pay compensation to a landowner (as does section 27 of the Transportation Corporations Law) leads us to conclude that the Legislature in enacting article 28 of the Executive Law, in which section 828 is contained, intended to act under the police power only (cf. ECL 24-0705, subd 7).[10]
In any event, what plaintiff seeks is a determination that because the section grants a statutory license to the CATV company holding the franchise for her area to attach its equipment to her property it is a facially invalid exercise of the police power and, if construed to be an exercise of the power of eminent domain, in that aspect as well.[11] As has long been recognized, administrative remedies provided by a statute need not be exhausted prior to the bringing of an action which challenges the enactment “in its entirety” as unconstitutional (Matter of Golden v Planning Bd. of Town of Ramapo, 30 NY2d 359, 365, supra; accord Euclid v Ambler Co., 272 US 365, 386; Watergate II Apts, v Buffalo Sewer Auth., 46 NY2d 52; Matter of Grimpel Assoc. v Cohalan, 41 NY2d 431; Scarsdale Supply Co. v Village of Scarsdale, 8 NY2d 325). Manhattan Cable Tel. v Uris 55 Water St. Co. (NYLJ, June 14, 1977, p 5, col 5), upon which defendants rely, is distinguishable because the party raising the question of constitutionality in *139 that case conceded the facial validity of section 828 and challenged only the section as applied in determining its compensation, while plaintiff in this case makes no such concession.
III
Plaintiff’s argument that crossovers are not within the scope of section 828 is predicated upon the use of the words “landlord” and “tenant” or “tenants” in the section and the reference to “services” in paragraph b of subdivision 1. Ignoring the use of the word “facilities”, she concludes that the entire section deals only with tenant service situations. While there is some support for her view in parts of the legislative history and in dictionary definitions of the words “landlord” and “tenant”, we conclude, in light of the declaration of legislative intent contained in article 28, the language of section 828 considered in its entirety, the use in paragraph a of the section of the word “facilities”, and parts of the legislative history, that the Legislature intended to proscribe interference by any owner of rental property with the installation of CATV facilities on his property whether used to furnish service to the tenant or tenants of the property on which installed or of another property or properties or both, but to permit such an owner to demand payment only from the CATV company making the installation and only for the service extended to tenants of his own property.
As we noted in Matter of City of New York v State of New York Comm. on Cable Tel. (47 NY2d 89, 92-93), the Commission “is invested with broad authority to oversee the burgeoning cable television industry” and is “endowed with broad power to regulate in the public interest,” which should not be inhibited “by unduly emphasizing a particular portion of the enabling act, of somewhat doubtful implication, at the expense of the whole.” The public interests sought to to be furthered by article 28 are identified in section 811, which recites that after “investigation of the public interest associated with cable television” the Legislature has determined that CATV operations involve “vital business and community service” which “must be *140 protected from undue restraint and regulation so as to assure cable systems with optimum technology and maximum penetration * * * as rapidly as economically and technically feasible”, that “the state would benefit from valuable educational and public services through cable television systems”, that a State agency is needed, therefore, “to promote the rapid development of the cable television industry” and “assure that cable television companies provide adequate, economical and efficient service to their subscribers,” and that the Legislature intends to vest in that agency authority “to stimulate the development of diverse instructional, educational, community interest and public affairs programming.”
Against the background of that declaration of intention, the provisions of section 828 are to be measured. While the word “landlord” is normally used to refer to a property owner in relation to his own tenant or tenants, it can also be understood in a sentence beginning “No landlord shall” as referring to landlords as a class, without reference to a particular tenurial relationship. The sense in which it is used in any given situation depends upon the context. Here the opening clause of paragraph a[12] is wholly consistent with the second rather than the first sense of the word “landlord”. The fact that clauses i and ii of paragraph a speak to the situation of tenants of a particular landlord[13] does not require a contrary conclusion, because they state the exceptional situations in which “a landlord” is permitted to impose conditions in relation to his own tenants. Consistent also with the generic rather than the particular use of the word “landlord” is the report of Commissioner William K. Jones of the Public Service Commission, prepared at the request of former Governor Rockefeller, entitled Regulation of Cable Television by the State of New York,[14] and the testimony of Joseph C. Swidler, Chairman of the Public *141 Service Commission, before the Joint Legislative Committee considering the CATV bill. The report recognized that “landlord impediment to the extension of CATV service is disadvantageous not only to the personal interests of tenants, but to development of the CATV industry” (at pp 206-207) and that the “proposal involves some intrusion upon the property interest of the landlord. But the interest intruded upon is a wholly abstract one — given the conditions specified, the landlord’s interest consists entirely of insisting that some negligible unoccupied space remain unoccupied. The tenant’s interest clearly is more substantial, consisting of a right to receive (and perhaps send) communications from and to the outside world. In the electronic age, the landlord should not be able to preclude a tenant from obtaining CATV service (or to exact a surcharge for allowing the service) any more than he could preclude a tenant from receiving mail or telegrams directed to him” (at p 207; emphasis supplied). And Chairman Swidler, testifying with respect to section 157 of A7809/1971, stated: “As you may know, landlords in many instances have imposed extremely onerous fees and conditions on cable access to their buildings. Clearly, landlords should be allowed to impose conditions governing the safety and appearance of their property and to require the CATV company or the tenant to bear the full cost of installation and indemnification for damage. Legislation is necessary, however, to prohibit gouging and arbitrary action.” (Emphasis supplied.)
As proposed in the Jones Report, as introduced and as first passed by the Legislature,[15] article 28 proscribed all payments to a landlord by anyone in any form for permitting CATV service on his property. At the same legislative session, however, paragraph b of subdivision 1 of section 828 was amended by chapter 467 to proscribe any payment by a tenant to a landlord for service, but to permit the landlord to accept from a CATV company a payment not greater than an amount which the Commission by regulation determined to be reasonable. No legislative history for the change has been presented or found. To be noted, how *142 ever, are the minimal additional[16] intrusion of a crossover extension, the legislative purpose to “assure * * * maximum penetration” and “promote the rapid development of the * * * industry” and the public benefit the.Legislature found to be involved in so doing, the testimony before the legislative committee that “landlords in many instances have imposed extremely onerous fees * * * on cable access to their buildings,” and the obvious difficulty of measuring the value of a crossover installation considering that such an installation is but a link in a chain that could encompass all properties in a square block. Bearing those considerations in mind, we find it improbable in the extreme that the Legislature intended to leave completely open the possibility of property owners obtaining “onerous fees” for the crossover portion of an installation, while at the same time providing a method[17] of limiting the amount a property owner could demand from a CATV company for allowing tenant service. More logical, in our opinion, because more consistent with the legislative plan, is the conclusion that the Legislature intended to proscribe interference with access for installation of facilities on the property for whatever purpose without any provision for payment, permitting payment only in relation to tenant service and then only within the limits fixed by the Commission. That there may at the time of an original installation of facilities be no tenant in that property receiving service does not militate against that conclusion, for the Legislature may properly have determined that no payment need be made, even in that situation, in view of the “negligible unoccupied space” taken up by the installation and the fact that once CATV facilities have come to a block tenants in the building may be expected to seek service.[18]
*143 IV
That, as stated in part II above the Legislature imposed no requirement for compensation makes unnecessary our consideration of many of the eminent domain arguments advanced by plaintiff. There remain, however, questions concerning whether section 828 constitutes proper police power action and whether if it does its interference with plaintiff’s property so far constitutes a “taking” as to invalidate it nonetheless.
A.
What is permissible under the police power varies with economic and social conditions. As the California Supreme Court put it more than half a century ago in Miller v Board of Public Works of City of Los Angeles (195 Cal 477, 484485), the power is “elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life and thereby keep pace with the social, economic, moral, and intellectual evolution of the human race.” The flexibility of the power and its availability not only in the interest of public health, safety and morals but also as a means of promoting the moral, intellectual and spiritual needs of our citizens, as well as public convenience and general prosperity, has been recounted in numerous decisions of this court and of the Supreme Court (Salamar Bldrs. Corp. v Tuttle, 29 NY2d 221, 227; Nettleton Co. v Diamond, 27 NY2d 182, 192-198, rearg den 28 NY2d 539, app dsmd 401 US 969; Matter of Wulfsohn v Burden, 241 NY 288, 298-299; People ex rel. Durham Realty Corp. v La Fetra, 230 NY 429, 446-447, app dsmd 257 US 665; Euclid v Ambler Co., 272 US 365, 387, supra; Block v Hirsh, 256 US 135, 155).
Here the purpose sought to be achieved, as stated by the Legislature (§ 811), is rapid development of and maxi *144 mum penetration by a means of communication which has important educational and community aspects. This is a legitimate purpose for use of the police power. Moreover, the provisions of section 828 are reasonably and substantially related to that purpose, bearing in mind the “ ‘onerous fees and conditions’ ” imposed by landlords to which Chairman Swidler testified (supra, at p 141) and the reasonable inference that, in part at least, development of the CATV industry and system, which at the time of the adoption of article 28 was more than 20 years old (see 1952 Opns Atty Gen 166), had been inhibited by such fees and conditions. Nor should it be lost sight of that the particular section in question is directly addressed to so much of the landlord-tenant relationship as is involved in development of the industry. Regulation of that relationship is a separately recognized police power purpose (People ex rel. Durham Realty Corp. v La Fetra, supra; Block v Hirsh, supra), and the economics of that relationship, whether involving rent directly charged to the tenant or an indirect cable installation cost charged to the CATV company making the installation and by it passed on to the tenant, bears a substantial relation to that purpose. Whether considered as to the first or the second purpose referred to above or as to both, section 828 is within proper police power bounds.
Once it has been found that the Legislature has acted on a subject within its powers and in a manner related to the intended end, it is irrelevant either that other or alternative means of achieving the same end are available (PruneYard Shopping Center v Robins, 447 US 74, 85, n 8; People v Griswold, 213 NY 92, 97) or that one of the effects of the enactment may be to benefit private as well as public interests (Block v Hirsh, supra, at p 155; see Noble State Bank v Haskell, 219 US 104, 110, 580).
B.
As we have had occasion previously to note, there is no “bright-line standard for differentiating permissible police power measures from overly vigorous and hence unconstitutional impositions” (Spears v Berle, 48 NY2d 254, 262). Rather “the facts of each case must be evaluated in order to determine the private and social balance of con *145 venience” (French Investing Co. v City of New York, 39 NY2d 587, 596, supra) and the “ [resolution of each case * * * ultimately calls as much for the exercise of judgment as for the application of logic” (Andrus v Allard, 444 US 51, 65, supra). Factors of significance in such an inquiry are “the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations” (PruneYard Shopping Center v Robins, supra, at p 83).
1.
The effect of the character in which government acts was articulated in Lutheran Church in Amer. v City of New York (35 NY2d 121,128-129) and restated in French Investing Co. v City of New York (supra, at p 593) as follows: “[Government interference [with the use of private property] is based on one of two concepts — either the government is acting in its enterprise capacity, where it takes unto itself private resources in use for the common good, or in its arbitral capacity, where it intervenes to straighten out situations in which the citizenry is in conflict over land use or where one person’s use of his land is injurious to others. (Sax, Taking and the Police Power, 74 Yale L. J. 36, 62, 63.) Where government acts in its enterprise capacity, as where it takes land to widen a road, there is a compensable taking. Where government acts in its arbitral capacity, as where it legislates zoning or provides the machinery to enjoin noxious use, there is simply noncompensable regulation.” Here, the State has acted not in furtherance of any governmental program normally carried on by government (such as the aircraft flights involved in United States v Causby, 328 US 256). Rather it seeks in the interest of education and the development of an additional system of communication to adjust “the benefits and burdens of economic life to promote the common good” (Penn Cent. Transp. Co. v New York City, 438 US 104, 124, reh den 439 US 883). It acts as arbiter not as entrepreneur.
But, argues plaintiff, there is here a physical invasion of the property which, whether by government or an entity or person authorized by government, necessarily consti *146 tutes a taking. The simple answer is that the cases do not bear out the argument.
New York Tel. Co. v Town of North Hempstead (41 NY2d 691), on which plaintiff heavily relies, is not in point because there the town, by enacting an ordinance granting itself the right to affix street lighting fixtures to the company’s poles, invaded the company’s property for a governmental purpose (see 41 NY2d, at p 697). As the Supreme Court noted in Penn Cent. Transp. Co. v New York City, 438 US 104, 124, supra), “A ‘taking’ may more readily be found when the interference with property can be characterized as a physical invasion by government” (emphasis supplied) .[19]
There are, moreover, numerous situations in which conceded invasions of private property authorized by government in the community interest but not directly for a governmental entreprenurial purpose have been upheld as valid exercises of the police power. The most recent is PruneYard Shopping Center v Robins (447 US 74, supra), already several times referred to. There the Supreme Court dealt with the California Supreme Court’s interpretation of the State Constitution as requiring that a shopping center owner permit solicitation of petition signatures in an orderly fashion in the common areas of the shopping center. Distinguishing its own earlier decisions holding that the First Amendment encompassed no such right, and characterizing the State constitutional provision as interpreted as the same as a statute enacted under the police power, the court held that notwithstanding that the common-law right to exclude others was (at p 82) “one of the essential sticks in the bundle of property rights,” the fact that the petition solicitors had “physically invaded” the shopping center was not determinative,[20] and that the State court *147 decision did not violate the due process property rights of the owner of the center. In a separate part of the opinion it considered not the First Amendment rights of the petition solicitors but the First Amendment rights of the shopping center owner, and held that forcing him to permit use of his property as a forum for speech by others did not violate the owner’s Federal free speech rights.
Additional examples are not wanting. No less an invasion of the right to exclude than that of which plaintiff complains was involved in People ex rel. Durham Realty Corp. v La Fetra (230 NY 429, app dsmd 257 US 665, supra) and People ex rel. Rayland Realty Co. v Fagan (194 App Div 185, affd 230 NY 653), both of which upheld a statute suspending for two years a landlord’s right to oust his tenant upon termination of the lease. Though in La Fetra we recognized that “The free choice of tenants; the unlimited right to bargain; these are property rights which may not be affected unless a public advantage over and beyond such rights justifies legislative interference” (at p 443), we held the taking analogous to the abatement of a nuisance and within the police power because (at p 444) “What is taken is the right to use one’s property oppressively and it is the destruction of that right that is contemplated and not the transfer thereof to the public use.”
Physical invasion closely analogous to that in the present case was involved in Jackman v Rosenbaum Co. (263 Pa 158, affd 260 US 22). In that case the Supreme Court of Pennsylvania affirmed entry of judgment for defendant notwithstanding the jury’s $25,000 verdict for plaintiff in a trespass action, where the trespass was in demolishing, in order to build a new party wall between plaintiff’s theatre building and defendant’s, the wall of plaintiff’s building in consequence of which for a substantial period of time plaintiff’s theatre could not be used. It did so on the ground that defendant’s entry on plaintiff’s land was not a trespass because in entering plaintiff’s land defendant “exercised merely a lawful right conferred upon him by valid police *148 statutes” which protected against the dangers of fire and contributed to the common economical management of adjoining properties (263 Pa, at p 172).[21] Substantially earlier party wall precedent is to be found in the English customary law which in 1189 required that neighbors give one and a half feet of land each in order to construct a three-foot party wall (Bosselman, Callies and Banta, The Taking Issue, p 62).
Not as closely in point but relevant to the present holding are Noble State Bank v Haskell (219 US 104, supra), upholding an assessment against all banks to guarantee repayment to depositors in any bank, notwithstanding the “invasion” of the bank’s treasury thus mandated, and cases upholding subdivision dedication requirements, such as our decision in Jenad, Inc. v Village of Scarsdale (18 NY2d 78) and that of the California Supreme Court in Ayres v City Council of City of Los Angeles (34 Cal 2d 31). Finally, it is not without significance that Professor Sax considered it an “important point” that “the presence or absence of a formal title-acquisition and/or invasion will never be conclusive” (74 Yale LJ, at p 67; emphasis supplied) and conceded that “one may be required to tolerate a physical invasion of the surface [of his land] without being constitutionally entitled to compensation” (81 Yale LJ, at p 163).
2.
Concerning economic impact, Mr. Justice Holmes, with characteristic colorfulness, spoke of the “petty larceny of the police power”[22] and wrote a number of decisions in the same vein.[23] That there are difficulties in applying a test with so fluid a concept as diminution of value is clear from scholarly analysis in the field.[24] Whatever the difficulties, *149 the case law establishes that degree of loss remains a factor which will invalidate a regulation when all but a bare residue of value is lost as a result of the regulation (French Investing Co. v City of New York, 39 NY2d 587, 596, supra; Lutheran Church in Amer. v City of New York, 35 NY2d 121,132, supra) but not when the regulation does not “unreasonably impair the value or use” of the property (PruneYard Shopping Center v Robins, 447 US, at p 83, supra; see, also, Agins v City Tiburon, 447 US 255) or does not interfere with the “primary expectation concerning the use of” the property (Penn Cent. Transp. Co. v New York City, 438 US 104, 136, supra), when there is a reasonable return on the property available to its owner even though without the regulation the value of the property would have been many times greater (Penn Cent Transp. Co. v City of New York, 42 NY2d 324; Modjeska Sign Studios v Berle, 43 NY2d 468, app dsmd 439 US 809) or when “the resulting loss to the owner is relatively slight and insubstantial” (People v Miller, 304 NY 105,108; see Kaiser Aetna v United States, 444 US 164, 180, supra) or “comparatively insignificant” (Noble State Bank v Haskell, 219 US 104, 110, supra).
Here plaintiff Loretto makes no claim that she is not receiving a fair return from the property. What she is saying is that an area of the building for which she does not claim to have any other use may not be used for the benefit of her tenants because without the statute she would be able to obtain a fee from the CATV company, payable in last analysis by the tenant, for failing to exercise her common-law right to exclude the CATV company from her property. But, as the Supreme Court held in Andrus v Allard (444 US 51, 65-66, supra), “the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full ‘bundle’ of property rights, the destruction of one ‘strand’ of the bundle is not a taking, because the aggregate must be viewed in its entirety.” Both judgment and logic dictate the conclusion that viewed *150 against the aggregate of plaintiff’s property rights the economic impact of the statute is insufficient to invalidate it.
3.
The situation is no different when we consider interference with reasonable investment-backed expectations. The meaning of the that somewhat esoteric phrase becomes clear if we contrast Kaiser Aetna v United States (supra), in which the Supreme Court found such interference, with PruneYard Shopping Center v Robins (supra), in which it did not. Kaiser Aetna leased a 6,000-acre area on the island of Oahu for subdivision development. The area included Kuapa Pond, a 523-acre private pond extending approximately two miles inland from the Pacific Ocean and separated from it by a barrier beach. Having created a marina-style community of some 22,000 persons around Kuapa Pond, including approximately 1,500 marina waterfront lot lessees who paid a regular annual fee of $72 for maintenance of the pond, Kaiser Aetna with the acquiescence of the United States Corps of Engineers dredged a deeper channel and increased the clearance under a highway bridge only to be told that by so doing they had subjected the pond to a navigational servitude and were precluded from denying the public access to it. Noting that Kaiser Aetna had invested substantial amounts of money in making improvements, the Supreme Court held that the right to exclude others from the pond had been physically invaded by the government’s imposition of a navigational servitude and that that could be done only by invoking the power of eminent domain. In PruneYard, on the other hand, the Supreme Court upheld a State constitutional provision which entitled citizens to exercise petition rights on the property of a shopping center notwithstanding the center’s efforts to exclude the persons soliciting signatures. Referring to the substantial sums that had been invested by the developer in Kaiser Aetna, the Supreme Court held (447 US, at p 84) that in PruneYard “appellants have failed to demonstrate that the ‘right to exclude others’ is so essential to the use or economic value of their property that the state-authorized limitation of it amounted to a ‘taking’.”
From those cases it is fair to conclude that the phrase *151 “reasonable investment-backed expectations” refers not to the over-all investment in the property, but to investment made with a now frustrated particular purpose or “expectation” in mind. Thus, in Kaiser Aetna there was investment in the improvement of the pond in the expectation that it would be open only to fee-paying members; in PruneYard no investment-backed expectation was found.[25] Here, as in PruneYard, there is no showing of any investment made in the expectation that fees would be derived from CATV installations separate and apart from the rent normally paid by the tenant. Such income as plaintiff and other property owners derived from CATV installations prior to enactment of section 828 arose not from any investment-backed expectation but from the combination of the owner’s common-law right of exclusion and the desire of tenants generally to avail themselves of CATV service, which infused value into what had previously been, as Commissioner Jones characterized it, “negligible unoccupied space.”
Tested against the Supreme Court’s factual inquiry criteria, section 828 is a valid police power exercise and not a taking.
V
The dissent’s insistence that there has been a taking is based upon a number of misconceptions.
First, the PruneYard case cannot be dismissed as a First Amendment case (dissent, n 2), for the only First Amendment question considered by the SuprenmCourt was whether the shopping center owner’s Federal constitutional rights were violated by the holding of the California Supreme Court that the free speech provision of the State Constitution required the owner to permit use of his property as a forum for the speech of others. By a divided court it held that it did not. The court was, however, unanimous in its *152 holding that the fact that the petition solicitors had “physically invaded” the owner’s property did not constitute a taking of property without just compensation. PruneYard is, therefore, on all fours with the instant case and, moreover, strongly suggests that Delaware, Lackawanna & Western R. R. Co. v Town of Morristown (276 US 182), upon which the dissent relies (dissent, at pp 161-162), would not be followed by the Supreme Court were it again presented with the same situation. Pumpelly v Green Bay Co. (13 Wall [80 US] 166) likewise does not support the dissent’s thesis, for the ultimate holding of Pumpelly was (at p 181) “that where real estate is actually, invaded * * * by having any artificial structure place on it, so as to effectually destroy or impair its usefulness, it is a taking” (emphasis supplied). Here, as in part IV (B.) (2.) above we have taken pains to point out, there is neither destruction nor impairment of usefulness[26] and physical invasion alone is not enough.[27]
Secondly, the rent control cases (La Fetra and Fagan) which the dissent in its footnote 2 seeks to distinguish are likewise in point. Those cases were not cited for the proposition that property can be taken for public use without compensation, but for their relevance to the “physical invasion” argument. The distinction between regulation and appropriation which the dissent seeks to draw in that footnote and in its discussion of “the traditional public appropriation *153 category” (atp 160) is simply inapplicable. The statute presently under consideration is not a “public appropriation” any more than was the rent control provision considered in La Fetra and Fagan. To call a provision which says a landlord may not put a tenant already on his property off a regulation, but characterize as a public appropriation a statute which says that a landlord must in the interest of his tenant let someone put something on the landlord’s property, is to ignore the reality that the physical and economic effects on the landlord in the two situations are identical. Nor does the passing reference in La Fetra to compensation distinguish the cases, for plaintiff Loretto (or the successor company) is likewise entitled to reasonable apartment rent from the tenants of 303 West 105th Street and, it may be surmised, gives up a great deal less (5% of the cable TV company’s fee, according to plaintiffs) than did the landlord in La Fetra (the difference in rent obtainable with and without controls in the housing crisis of a war emergency economy).
Finally, in stating that there is no reason for foreclosing fair compensation here (dissent, at p 162) and that the majority offers no rationale for its distinction between cable TV companies and telephone companies or other utilities (at p 161), the dissent misconceives the thrust of this opinion. What it holds is that the State may proscribe a trespass action by landlords generally against a cable TV company which places a cable and other fixtures on the roof of any landlord’s building, in order to protect the right of the tenants of rental property, who will ultimately have to pay any charge a landlord is permitted to collect from the cable TV company, to obtain cable TV service in their respective apartments. The bases upon which the Legislature may do so are its power to regulate landlord-tenant relationships and its power to encourage development of an educational and communications medium. Doing so, the State takes nothing for itself as entrepreneur and acts well within its police power.[28]
*154 The distinction between cable TV companies and telephone and telegraph companies is in the legislation under which they function. A company of the latter sort is authorized to “construct and maintain its necessary stations, plants, equipment or lines upon, through or over any other land, subject to the right of the owners thereof to full compensation for the same” (Transportation Corporations Law, § 27), and the owners’ rights to compensation are further protected by sections 261 and 335-a cf the Real Property Law. The statute now under consideration (Executive Law, § 828) provides to the contrary that no owner of rental property may demand or accept any payment from a cable TV company “in excess of any amount which the commission shall, by regulation, determine to be reasonable.” That language in fixing a maximum amount and using the word “any” clearly contemplates that no amount may be payable to a landlord by a cable TV company. That fact and the fact that, as noted in part II above, the Executive Law provision makes no reference to the Transportation Corporations Law’s requirement of compensation furnish a clear rationale (the differing legislative purposes and intents) for treating cable TV companies differently from telephone and telegraph companies.
VI
What creates the need for installation of CATV facilities on rental properties is the desire for such facilities by the inhabitants of the properties. As part of its regulation of the rights of tenants and landlords and in furtherance of the development of CATV as a communications and educational medium, the Legislature may proscribe the landlord’s exaction of any charge over the regular rent for CATV service, whether that charge be imposed directly against the tenant or indirectly by requiring payment of it by the CATV company which will in turn impose it upon the tenant. Neither the physical invasion of the landlord’s property by the attachment of such facilities nor the fact that at the time the facilities are attached to a building no tenant of that building is a CATV subscriber invalidate the *155 legislative exercise of the police power, in view of the minimal nature of the invasion and the absence of any reasonable expectation on the part of the landlord that the space thus utilized (or invaded) would ever be income productive.
In sum, this simply is not, as the dissent would have it, a “traditional public appropriation case.” Accordingly, the order of the Appellate Division should be affirmed, with costs.

. Hereafter “CATV”.

. Hereafter “Commission”.

. Hereafter collectively referred to as “TelePrompter”.

. That section which is entitled “Landlord-tenant relationship” provides:
“1. No landlord shall
“a. interfere with the installation of cable television facilities upon his property or premises, except that a landlord may require:
“i. that the installation of cable television facilities conform to such reasonable conditions as are necessary to protect the safety, functioning and appearance of the premises, and the convenience and well-being of other tenants;
“ii. that the cable television company or the tenant or a combination thereof bear the entire cost of the installation, operation or removal of such facilities; and
“iii. that the cable television company agree to indemnify the landlord for any damage caused by the installation, operation or removal of such facilities.
“b. demand or accept payment from any tenant, in any form, in exchange for permitting cable television service on or within his property or premises, *132 or from any cable television company in exchange therefor in excess of any amount which the commission shall, by regulation, determine to be reasonable; or
“c. discriminate in l’ental charges, or otherwise, between tenants who receive cable television service and those who do not.
“2. Rental agreements and leases executed prior to the effective date of this article may be enforced notwithstanding this section.
“3. No cable television company may enter into any agreement with the owners, lessees or persons controlling or managing buildings served by a cable television, or do or permit any act, that would have the effect, directly or indirectly of diminishing or interfering with existing rights of any tenant or other occupant of such building to use or avail himself of master or individual antenna equipment.”

. The giving of notice to the class was, however, adjourned until determination of the motion and cross motion for summary judgment hereafter referred to. So far as revealed by the record before us, no notice has ever been given.

. A crossover occurs when (1) the line servicing the tenants in a particular building is extended to adjacent or adjoining buildings, (2) an amplifier which is placed on a building is used to amplify signals to tenants in that building and in a neighboring building or buildings, and (3) a line is placed on a building, none of the tenants of which are provided CATV service, for the purpose of providing service to an adjoining or adjacent building. Plaintiff did not seek summary judgment with respect to damages in crossover situations because she conceded that the 5% damage formula sought to be enforced does not apply to crossovers.

. The motion of the Attorney-General and defendants to dismiss the appeal for want of a substantial constitutional question was denied (51 NY2d 1007). The motion did not raise any issue concerning Abeel’s right to appeal from the Special Term order and judgment, but he clearly -had no right to appeal from any part of Special Term’s determination other than its denial of his intervention motion. For reasons hereafter stated we do not reach that question and, therefore, need not consider whether he was entitled to appeal to our court from the Appellate Division’s affirmance of the order denying leave to intervene (but see Cohen and Karger, Powers of the New York Court of Appeals, pp 193, 595).

. CPLR 1003 and 1021 would permit our joining Hargate as a party to the action, even at this stage, but we perceive no immediate reason for doing so and consider it best to leave that question to determination by Special Term should any party believe it advantageous or necessary to make a motion permitting or requiring such joinder (see Udell v Haas, supra).

. The argument excepts so much of the action as seeks to recover for crossovers, which defendants concede are not within section 828 (subd 1, par b). On the latter point, see section III, infra. If correct that concession would, however, raise a question concerning the adequacy of the available administrative review (see Ulmer Park Realty Co. v City of New York, 267 App Div 291, 294, mot for lv to app den 267 App Div 879; Matter of Cherry v Brumbaugh, 255 App Div 880; ALI Model Land Development Code [Proposed Off Draft], p 498).

. Comparable statutes in Connecticut (Conn Gen Stats Ann, tit 16, § 16-333a), and Massachusetts (Mass Gen Laws Ann, ch 166A, §22) either proscribe any payment to an owner of a multiunit residential building or simply imply the owner’s consent from delivery to him of a copy of the statute and a statement, signed by the CATV company, agreeing to be bound by it.

. The grounds urged for the latter contention are that the section provides for determination of compensation by regulation rather than judicial decision, fails to provide for payment in advance of taking or security for such payment though the taking be by a private company, and leaves the determination of compensation to an administrative body the budget of which is funded almost entirely by assessments against the gross receipts of the companies that are parties to such determinations.

. The wording of that clause is “interfere with the installation of cable television facilities upon his property or premises”.

. In earlier versions clause (iii) also included the words “the tenant”. (A7809/1971, §157; S9823/1972, § 828.)

. See the Governor’s Message on approval of chapters 466 and 467 of the Laws of 1972 (1972 McKinney’s Session Laws of NY, p 3395).

. (L 1972, ch 466.)

. The crossover extension on the Loretto property is but 4 to 6 feet of cable in addition to the intrusion for tenant service which, according to the Jones Report, is only upon “negligible unoccupied space.”

. The method provided is similar to that which prevailed under New York City Rent Control, which allowed a $2 monthly surcharge by a landlord to those of his tenants having CATV service.

. Not only does that conclusion further the legislative policies concerning the educational and communications value of cable television declared in section 811 of the Executive Law but also it is supported by the inclusion in *143 the exemptions from execution declared by CPLR 5205 (subd [a], par 5) of “one television set”, by which the Legislature has explicitly recognized television as a practical necessity of modern living. That factor plus the modern view of the police power which includes as a basis for its exercise aesthetics (Suffolk Outdoor Adv. v Hulse, 43 NY2d 483, app dsmd 439 US 808; Modjeska Sign Studios v Berle, 43 NY2d 468, app dsmd 439 US 809; People v Goodman, 31 NY2d 262) furnish a valid ground for' differentiating television, including cable television, from other private industry.

. Though the invasion in North Hempstead was more than minimal, not every entreprenurial invasion by government is a taking. See United States v Causby (328 US 256, 265-266), where after pointing out that there was “a direct invasion of respondents’ domain” the court quoted from United States v Cress (243 US 316, 328) “it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking” (emphasis supplied).

. Contrast Kaiser Aetna v United States (444 US 164, 179-180), where in *147 vasion of the same right to exclude was held to constitute a taking because as the court later explained in PruneYard (447 US, at p 84) “The Government’s attempt to create a public right of access to the improved pond interfered with Kaiser Aetna’s ‘reasonable investment backed expectations.’ ”

. The United States Supreme Court, affirming, did not reach the constitutional question because it found that the custom of party walls was introduced by the first settlers and that a statute embodying that understanding did not need to invoke the police power.

. (1 Holmes-Laski Letters [Howe ed, 1953], p 475, explaining that at the request of his colleagues he had deleted the phrase from his opinion in Jackman v Rosenbaum Co., 260 US 22, supra.)

. The decisions are reviewed in chapter 8 of Bosselman, Callies and Banta, The Taking Issue.

. (Id., pp 208-210; Sax, Takings and the Police Power, 74 Yale LJ 36, *149 44-46, 50-60; Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of “Just Compensation” Law, 80 Harv L Rev 1165, 1190-1193; Van Alstyne, Modernizing Inverse Condemnation: A Legislative Prospectus, 8 Santa Clara Lawyer, 1, 16-17.)

. Consistent with this interpretation of the phrase is the Supreme Court’s use of it in Penn Cent. Transp. Co. v City of New York (438 US 124, 127, supra) to describe its earlier holding in Pennsylvania Coal Co. v Mahon (260 US 393). In Mahon the court invalidated a statute forbidding the mining of coal that would cause subsidence of any house, noting that the coal company had sold the surface rights to the land in question but expressly reserved the right to remove the coal and that the statute would destroy this “expectation”.

. City of Albany v State of New York (28 NY2d 352) and Heyert v Orange & Rockland Utilities (17 NY2d 352), cited at page 160 of the dissent, are not to the contrary. In both we held that whether what was taken had only nominal value was beyond our jurisdiction to consider (17 NY2d, at p 364; 28 NY2d, at p 360) and in Heyert we noted further that the easement was “in essence a partial taking which, in many ways, may cause only nominal damage but in some instances may result in serious consequential damage to the adjacent land” (17 NY2d, at p 364; emphasis supplied).

. While relying on Professor Sax in one respect (dissent, at n 1), the dissent quotes Professor Michelman (dissent, at p 160) on physical invasion and ignores Professor Sax’ view that physical invasion “ ‘will never be conclusive’ ” (stated in both of his articles and quoted above at p 148). What it overlooks is that what Professor Michelman is discussing (as the quotation in the dissent shows) is “when the government deliberately brings it about that its agents, or the public at large, ‘regularly’ use, or ‘permanently’ occupy, space” (at p 1184; emphasis supplied), and that the section of Michelman’s article referred to discusses “when government in fact makes regular or permanent use of a thing” (at p 1186).

. The dissent fails to recognize the legislative restriction of section 828 to rental properties and the part that restriction plays in our holding, as is shown by its suggestion (dissent, at p 161) that the concept of this opinion would *154 permit telephone companies to place poles across a person’s front yard without compensation.