# OCTOBER TERM, 1937.*

## TOEBE v. CITY OF MUNISING.

1. MUNICIPAL CORPORATIONS—CHARTERS—CONSTITUTION—STATUTES.
   Municipal charters together with all laws and ordinances relating to municipal concerns, are subject to the provisions of the Constitution and the general laws of the State (Const. 1908, art. 8, § 21).

2. SAME—POWERS.
   A municipal corporation possesses and can exercise powers (1) granted in express words, (2) necessarily or fairly implied in or incident to powers expressly granted, and (3) essential to accomplishment of declared objects and purposes of the corporation, not those simply convenient for doing so; all fair, reasonable, substantial doubt concerning the existence of power being resolved against the corporation.

3. SAME—EMERGENCY—SUPPLYING FUEL.
   That in a real emergency a municipality may supply fuel to its inhabitants to prevent general suffering from lack of obtainable fuel under justification of overruling public necessity is but a charitable obscuration of existing law and the control ends when real justification ceases.

4. SAME—PROPRIETARY BUSINESS ACTIVITY—COAL.
   Plaintiffs *held*, entitled to engage in legitimate private business of furnishing coal to a community free from unauthorized proprietary business activity by home rule city notwithstanding city had been practically the sole distributor of coal to the public for some 12 or 13 years, and did so without substantial profit (Const. 1908, art. 8, §§ 21, 23).

BUSHNELL and CHANDLER, JJ., dissenting.

---

* Continued from Vol. 281.

Appeal from Alger; Runnels (Herbert W.), J. Submitted June 22, 1937. (Docket No. 57, Calendar No. 39,422.) Decided November 10, 1937.

Bill by Walter Toebe and Munising Coal Company, a Michigan corporation, against City of Munising, a municipal corporation, to restrain the selling of coal to consumers, for the voiding of a lease and other relief. Bill dismissed. Plaintiffs appeal. Reversed.

*George C. Quinnell,* for plaintiffs.

*Glenn W. Jackson* (*Clifford L. Peters,* of counsel), for defendant.

*Raymond W. Starr,* Attorney General, and *Edmund E. Shepherd,* Assistant Attorney General, *amici curiæ.*

BUSHNELL, J. (*dissenting*). For some 12 or 13 years the city of Munising, located about 400 miles north of the city of Lansing, on the south shore of Lake Superior in the upper peninsula of Michigan, has been selling coal to the public. During this time no one operated a coal business in that city until plaintiff, the Munising Coal Company, undertook to compete with the municipality. This corporation was organized by Walter Toebe on June 24, 1936, and plaintiff's bill of complaint was filed less than 15 days later, challenging the claimed illegal, wrongful and unconstitutional acts of the municipality which are also alleged to contravene the certain provisions of the city charter. Plaintiffs sought an injunction restraining the city from purchasing or selling coal as a commercial enterprise and asked that a certain year to year lease between defendant and the Munising Paper Company, covering a part of the latter's dock for use in unloading and storing coal, be declared void.

Munising has a population of approximately 3,950 people and in addition to being accessible by lake steamers which do not operate during the winter months, the city is served during the entire year by the Lake Superior & Ishpeming Railway Company with four trains a day, two each way. This line has connection with four other railroads within 38 miles of Munising. State highways M–28, M–94 and M–41 connect Munising with other cities located at the following distances, *viz.,* Sault Ste. Marie, east, 130 miles; Manistique, southeast, 45 miles; Escanaba, south, 63 miles, and Marquette, west, 50 miles. These highways are all kept open during the winter for traffic.

Most of the coal used in the upper peninsula of Michigan comes from the States of Virginia, Ohio, Kentucky, and Pennsylvania and the freight rates to both Munising and Marquette from these fields are between $4.67 and $4.87 per ton. Freight rates on coal per ton to Munising are $1.22 from Marquette, $2.52 from Escanaba and $1.68 from Manistique and from Toledo, Ohio, to Manistique are $3.09 and $3.29 per ton. The water rate from Toledo to Munising is but 40 cents a ton plus 5 cents for insurance. The average contents of a carload of coal is 60 tons and the people now served by the municipality use in excess of 100 carloads of coal per year.

From September 1, 1930, to September 16, 1936, the city sold 27,058,105 tons of coal at an average price of $6.24 per ton and it purchased 27,926,980 tons at an average price of $5.10 making a gross profit of $26,462.11 against which was charged expenses of $24,542.96, leaving a net gain during the six-year period of $1,919.15.

The coal transactions are kept in separate accounts from other city transactions and there was a cash

balance in the coal fund at the close of business on September 16, 1936, of $4,836.87, which includes, however, $3,425.13 deposited in a closed bank, making the present available cash balance $1,411.74.

Aside from coal furnished the schools and other governmental subdivisions, the coal business is conducted by the city on a cash basis and no attempt is made to earn a profit on the operations. Money was borrowed from the bank for the coal fund in 1935, coal having been previously purchased on credit by giving notes signed in behalf of the city by its mayor and clerk.

A year or two ago the city's coal money was tied up by the closing of a depository bank and money was transferred from the general fund to meet this emergency. The city has enough coming from the closed bank to replace the money advanced from the general fund and, other than as stated, "No money raised by taxes is used in payment for the handling of the coal purchased by the city or otherwise."

Plaintiff argues that the operation of the coal business by the city involves the expenditure of tax money by the pledging of the city's credit and the use of its funds by the issuance of notes, the heretofore mentioned transfer from the general fund, and by its failure to charge against the coal account sufficient amounts to cover fire insurance on stored coal, the proper cost of public liability and compensation insurance. Plaintiffs also charge the city with failure to maintain a fund for repairs, upkeep and replacement of equipment, and say this will eventually require the expenditure of public funds.

Plaintiffs further say there is nothing peculiar about the geographical locality of the city or the circumstances of the needs of its inhabitants that makes dealing in coal a governmental function and that the funds and credit of the city now being used

by it in dealing in coal are not being used for a public purpose.

Defendant city contends that its operations in this respect are a lawful governmental function, authorized by its charter and the statutes and Constitution of the State, and that the trial court was justified in refusing the relief prayed for by plaintiffs.

The trial judge did not file a written opinion but embodied the following findings in the decree:

"The city of Munising has purchased and distributed coal substantially at cost, to its inhabitants, for upwards of 10 years, during which time it has been the only distributor of coal at retail, except for one carload of approximately 23 tons sold by plaintiff, Munising Coal Company, and a small amount of coal sold by the Munising Paper Company to its own employees; and that such purchase of coal and the expense of distribution of the same has been paid from the receipts of the sale of said coal; and that no loss has so far been occasioned to the taxpayers by reason of the dealing in coal by said defendant; and that the only tax funds used by defendant is the sum of approximately $4,800, which was borrowed from the general fund, due to receipts from the sale of coal being impounded by the closing of the Peoples State Bank and that part of said moneys have been repaid, and there appears that there will be ample funds available from the deposit in said closed bank to replace the moneys borrowed by the city from its general fund, for the distribution of coal; and that the city of Munising has facilities for supplying its inhabitants with coal during the coming winter season; and that plaintiff coal company has no coal on hand and has no facilities at present for the handling of coal; and that there is no other firm, person or corporation in the city of Munising, now prepared to furnish coal to its inhabitants for the coming winter; and it further ap-

pearing that the purchase and sale of coal is a proper and lawful method of supplying heat to the inhabitants of the city of Munising, now therefore,'' etc.

The court denied any relief to plaintiffs and ordered their bill of complaint dismissed, without costs.

We believe the matter should be determined upon the question of the right of this municipality to furnish coal to its inhabitants and others nearby, under the facts as disclosed by this record.

The city of Munising is incorporated under the home rule act (1 Comp. Laws 1929, §§ 2228–2274) and is authorized under section 2233 to acquire, own, purchase, construct or operate any public utility, etc. Section 2236 permits home rule cities to provide in their charter ''for the purchase or condemnation of the franchises, if any exist, and of the property used in the operation of companies or individuals engaged in the plank road, cemetery, hospital, almshouse, electric light, gas, heat, water and power business,'' etc.

The people of Munising, through the adoption of their city charter, have authorized the acquiring and operation of public works and have stated in chapter 2, § 5 of the charter that the city ''may sell and deliver water, heat, power and light without its corporate limits in any amount not to exceed 25 per cent. of that furnished by it within its corporate limits for like purposes.''

Chapter 2, § 6, of the charter says:

''Subject to the limitations of the Constitution and laws of this State, the city may contribute to, promote or engage in and prosecute any non-sectarian charity, benevolence or public celebration and any enterprise, business, trade or occupation for profit or otherwise.''

Another section permits the leasing of real or personal estate or interest or easement therein (section 4), and another, chap. 8, § 1, provides:

"The council may adopt and enforce ordinances and regulations, and may do and perform any and all other acts to advance the interests of the city, for the good government and prosperity of the municipality, and for the general welfare, prosperity and happiness of the inhabitants thereof, not prohibited by the Constitution and laws of this State."

The Constitution of Michigan of 1908, art. 8, § 22, authorizes any city or village to acquire, own, establish and maintain, either within or without its corporate limits, parks, boulevards, cemeteries, hospitals, almshouses and all works which involve public health or safety, and section 23 of the same article provides that cities or villages may acquire, own and operate either within or without its corporate limits, public utilities for supplying water, light, *heat,* power and transportation to the municipality and the inhabitants thereof. The constitutional limitation on the city's power is expressed in section 25, which says:

"No city or village shall have power to abridge the right of elective franchise, to loan its credit, nor to assess, levy or collect any tax or assessment for other than a public purpose."

Decision rests upon whether the operation of the coal business by the city of Munising is the conducting of a public utility, and, if so, is the selling of coal by this municipality authorized by the term "supplying * * * heat?"

After 13 years of operation which has been satisfactory to all the people of Munising except plaintiffs and their witness Cox, who failed to get stoker

coal because his bin was not completed, we should be reluctant to declare the acts of the municipality illegal unless contrary to the limitations of the Constitution and laws of this State.

We quoted from *Cawker* v. *Meyer,* 147 Wis. 320 (133 N. W. 157, 37 L. R. A. [N. S.] 510), in *People* v. *Powell,* 280 Mich. 699 (111 A. L. R. 721). In defining a sale to the public, the Wisconsin court said:

"It is very difficult, if not impossible, to frame a definition for the word 'public' that is simpler or clearer than the word itself."

The same observation might be made of the words "public purpose," as used in section 25 of the Constitution, for

"Local conditions are of such a varying character that what is or is not a public use in a particular State is manifestly a matter respecting which local authority, legislative and judicial, has peculiar facilities for securing accurate information." *Jones* v. *City of Portland,* 245 U. S. 217 (38 Sup. Ct. 112, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660).

Section 23 authorizes a municipality to operate a public utility to supply heat, but it does not limit the form of the "heat" or the manner in which it is to be supplied other than through the use of the vehicle of "public utility."

A public utility is defined in Webster's New International Dictionary (2d Ed.), as: "Called also utility. A business organization performing some public service and hence subject to special governmental regulation, such as fixing of rates, requirement of incidental activities," etc.

The same authority defines "public service" as

"The business of supplying some commodity (as gas, electricity, power, water) to any or all members

of a community or of providing some service (as transportation, as by railroad, or bus or by pipe line; communication by telegraph or telephone; elevating grain, maintaining stockyards), where exercise of the calling involves some legal privilege or a natural or virtual monopoly.''

The usual method of furnishing heat is in the form of steam through pipes from a central heating plant, but heat may also be furnished by piping combustible natural or artificial gas, or by the transmission of electricity and also by the piping of fuel oil. Heat is actually conveyed by either conduction, convection or radiation.

The physicist would narrow all of the foregoing down to the statement that heat is nothing more or less than the kinetic and potential energy of a body's invisible molecules.

If the city of Munising had erected a central heat generating plant in which coal was used, it could not be argued that it was engaging in an illegal act, and its operation of a business organization (public utility) which performs a public service by supplying the coal which may be burned in order to produce the same heat which the city might otherwise legally furnish, should not be declared illegal unless forbidden by law.

This manner of doing indirectly that which may be done directly, is not proscribed by the language of the Constitution.

The constitutional and statutory power to supply ''heat'' was held by the court of Maine to include the power to conduct a municipal fuel yard where the legislature of that State authorized the operation of such projects. See *Laughlin* v. *City of Portland,* 111 Me. 486 (90 Atl. 318, 51 L. R. A. [N. S.] 1143, Ann. Cas. 1916C, 734), and *Jones* v. *City of Portland,* 113

Me. 123 (93 Atl. 41). In affirming the latter, the Supreme Court of the United States said:

"The authority to furnish light and water by means of municipally owned plants has long been sanctioned as the accomplishment of a public purpose justifying taxation with a view to making provision for their establishment and operation. The right of a municipality to promote the health, comfort and convenience of its inhabitants by the establishment of a plant for the distribution of natural gas for heating purposes was sustained, and we think properly so, in *State* v. *Toledo,* 48 Oh. St. 112 (26 N. E. 1061, 11 L. R. A. 729). We see no reason why the State may not, if it sees fit to do so, authorize a municipality to furnish heat by such means as are necessary and such systems as are proper for its distribution. Heat is as indispensable to the health and comfort of the people as is light or water. In any event we are not prepared to say that when a State authorizes a municipality to tax with a view to providing heat at cost to the inhabitants of the city, and that purpose is declared by the highest court of the State to be a public one, the property of a citizen who is taxed to effect such purpose is taken in violation of rights secured by the Constitution of the United States." *Jones* v. *City of Portland,* 245 U. S. 217 (38 Sup. Ct. 112, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660).

In arriving at its conclusion, the court quoted the following from *Laughlin* v. *City of Portland, supra.*

"In the case of *Laughlin* v. *City of Portland,* 111 Me. 486 (90 Atl. 318, 51 L. R. A. [N. S.] 1143, Ann. Cas. 1916C, 734), the matter was fully considered by the supreme judicial court of that State. After reviewing the cases which established the general authority of municipalities in the interest of the public health, convenience, and welfare to make provisions for supplying the inhabitants of such communities with water, light and heat by means adequate for

that purpose, the court came to consider the distinction sought to be made between the cases which sustain the authority of the State to authorize municipal action for the purposes stated, and the one under consideration, because of the fact that in the instances in which municipal authority has been sustained the use of the public streets and highways for mains, poles and wires in the distribution of water, light and heat had been required under public authority, whereas in supplying fuel to consumers, under the terms of the law in question, no such permission was essential, the court said (111 Me. 486, 496):

" 'Let us look at the question from a practical and concrete standpoint. Can it make any real and vital difference and convert a public into a private use if instead of burning the fuel at the power station to produce the electricity, or at the central heating plant to produce the heat and then conducting it in the one case by wires and in the other by pipes to the user's home, the coal itself is hauled over the same highway to the same point of distribution? We fail to see it. It is only a different and simpler mode of distribution and, if the legislature has the power to authorize municipalities to furnish heat to its inhabitants "it can do this by any appropriate means which it may think expedient." The vital and essential element is the character of the service rendered and not the means by which it is rendered. It seems illogical to hold that a municipality may relieve its citizens from the rigor of cold if it can reach them by pipes or wires placed under or above the highways but not if it can reach them by teams traveling along the identically same highway. It will be something of a task to convince the ordinarily intelligent citizen that an act of the legislature authorizing the former is constitutional but one authorizing the latter is unconstitutional beyond all rational doubt. For we must remember that we are considering the existence of the power in the legislature which is the only question before the court and not the wisdom of its exercise which is for the legislature alone.'

"Answering the objection that sustaining the act in question opens the door to the exercise of municipal authority to conduct other lines of business and commercial activity to the destruction of private business, the court said (111 Me. 486, 500):

" 'But it is urged, why, if a city can establish a municipal fuel yard, can it not enter upon any kind of commercial business, and carry on a grocery store, or a meat market or a bakery. The answer has already been indicated. Such kinds of business do not

measure up to either of the accepted tests. When we speak of fuel, we are dealing not with ordinary articles of merchandise for which there may be many substitutes, but with an indispensable necessity of life, and more than this, the commodities mentioned are admittedly under present economic conditions regulated by competition in the ordinary channels of private business enterprise. The principle that municipalities can neither invade private liberty nor encroach upon the field of private enterprise should be strictly maintained as it is one of the main foundations of our prosperity and success. If the case at bar clearly violated that principle it would be our duty to pronounce the act unconstitutional, but in our opinion it.does not. The element of commercial enterprise is entirely lacking. The purpose of the act is neither to embark in business for the sake of direct profits (the act provides that fuel shall be furnished at cost) nor for the sake of the indirect gains that may result to purchasers through reduction in price by governmental competition. It is simply to enable the citizens to be supplied with something which is a necessity in its absolute sense to the enjoyment of life and health, which could otherwise be obtained with great difficulty and at times perhaps not at all, and whose absence would endanger the community as a whole.' ''

The Nebraska court has held that the power to operate plants and property for the purpose of supplying heat was not broad enough to include the power to sell fuel. See *Consumers Coal Co.* v. *City of Lincoln*, 109 Neb. 51 (189 N. W. 643), and the Massachusetts court, in several advisory opinions, held that public funds could not be used for the purpose of buying and selling coal by municipalities to its citizens in competition with dealers in coal. See *Opinion of the Justices*, 155 Mass. 598, 601 (30 N. E. 1142, 15 L. R. A. 809), and 182 Mass. 605, 610 (66 N. E. 25, 60 L. R. A. 592), both of which were cited in *Baker* v. *City of Grand Rapids*, 142 Mich. 687. Many authorities on this subject, *pro* and *con*, are also annotated in 14 A. L. R. at page 1157, *et seq.*

Under somewhat broader powers than are given to municipalities in Michigan it was held that a home rule city in Texas might manufacture ice. See *City of Denton* v. *Denton Home Ice Co.*, 119 Tex. 193 (27 S. W. [2d] 119, 68 A. L. R. 866).

Plaintiffs claim the *Baker Case, supra,* is controlling, and that we held that the only time when a city

is justified in selling coal to its inhabitants is when a coal famine seems imminent. Such a statement is found in the *Baker* opinion but that case was decided upon other grounds. We said in the *Baker Case:*

"Complainant commenced his suit in his own behalf to restrain the city from unlawfully injuring him in his business and from subjecting his property to the burden of an unlawful assessment for taxes. Neither by his bill of complaint nor by the evidence in the case does it appear that the court had jurisdiction under the statute (Act No. 183, Pub. Acts 1903) to restrain the proceedings taken or to be taken which might have resulted in a tax being levied upon his property, for the reason that it would not have amounted to more than $100. The record shows that the complainant has not made a case entitling him to relief.

"For the reasons stated, the decree of the court below is affirmed, with costs of both courts."

While the city of Munising does not owe plaintiff any immunity from competition, *Andrews* v. *City of South Haven,* 187 Mich. 294 (L. R. A. 1916A, 908, Ann. Cas. 1918B, 100), it is not entering into competition with other dealers of coal as was the situation in *Baker* v. *City of Grand Rapids, supra,* nor is it seeking to prevent anyone from engaging in the coal business in the locality. It seems to us that the municipality is merely meeting a situation that actually exists because of its geographical location and the great distance from a source of supply as well as the uncertainty of its inhabitants being supplied with adequate fuel during the rigors of the northern winters.

Counsel for the city, upon oral argument, was unwilling to state that such an emergency existed as was disclosed in the *Baker Case, supra.* We can,

however, take judicial notice of the fact that the price of coal is determined in greater part by its cost at the mine, plus freight and handling charges, and that in a city of but 4,000 people, located on the south shore of Lake Superior, it is necessary for the safety and welfare of its inhabitants that an adequate supply of fuel should be assured for the winter months. The record shows that until plaintiff entered the coal business less than 15 days before the filing of its bill of complaint, the municipality was without any dealers in this absolute necessity of life, and it is apparent from the testimony of plaintiff Toebe, that at the time of trial, October 24, 1936, the Munising Coal Company was not yet in a position to supply adequately the needs of the public. The city, on the other hand, has done nothing that will prevent plaintiff from engaging in the coal business if it sees fit to do so.

See observations on comparable situations in 19 R. C. L. pp. 720, 721.

We must of necessity limit our decision to the facts presented in the record now before us. Being so circumscribed, the decree of the trial court should be affirmed, with costs to appellee.

CHANDLER, J., concurred with BUSHNELL, J.

WIEST, J. I do not join in the views of Mr. Justice BUSHNELL.

Municipal charters, together with all laws and ordinances relating to municipal concerns, are subject to the provisions of the Constitution and the general laws of the State. Const. of 1908, art. 8, § 21.

The Constitution, in section 23 of the mentioned article, empowers cities to acquire, own and operate, "public utilities for supplying water, light, heat,

power and transportation to the municipality and the inhabitants thereof.'' If supplying fuel falls within the term ''heat'' then it must be classed as a public utility and regulated by law on that subject.

The reasoning of my Brother that power to furnish heat from a city public utility plant carries power to supply fuel for the creation of heat was a thought carried in *Laughlin* v. *City of Portland,* 111 Me. 486 (90 Atl. 318, 51 L. R. A. [N. S.] 1143, Ann. Cas. 1916C, 734), but the thought had legislative backing in that case, for the statute of Maine provided:

''Any city or town is hereby authorized and empowered to establish and maintain within its limits, a permanent wood, coal and fuel yard, for the purpose of selling, at cost, wood, coal and fuel to its inhabitants. The term 'at cost' as used herein, shall be construed as meaning without financial profit.'' Pub. Laws, 1903, chap. 122 (R. S. chap. 4, § 87).

The Maine court reasoned:

''Can it make any real and vital difference and convert a public into a private use if instead of burning the fuel at the power station to produce the electricity, or at the central heating plant to produce the heat and then conducting it in the one case by wires and in the other by pipes to the user's home, the coal itself is hauled over the same highway to the same point of distribution?''

It may be conceded that, under the authority of *Jones* v. *City of Portland,* 245 U. S. 217 (38 Sup. Ct. 112, L. R. A. 1918C, 765, Ann. Cas. 1918E, 660), if compatible with the Constitution, the legislature may authorize a municipality to establish a public yard for the sale of coal or other fuel.

''It is a general and undisputed proposition of law that *a municipal corporation possesses and can exer-*

*cise the following powers, and no others:* First,
those granted in *express words;* second, those *neces-*
*sarily or fairly implied* in or *incident* to the powers
expressly granted; third, those essential to the ac-
complishment of the declared objects and purposes
of the corporation,—not simply convenient, but in-
dispensable. Any fair, reasonable, substantial doubt
concerning the existence of power is resolved by the
courts against the corporation, and the power is
denied." 1 Dillon, Municipal Corporations (5th
Ed.), § 237.

It may be that in case of a real emergency, and
in order to prevent general suffering from lack of
obtainable fuel, the municipality may supply such
essential need under the justification of overruling
public necessity; but, even in such case, the law is
only temporarily mute and the silence, so imposed,
is not an extension of power. It is but an instance
within the maxim *"Necessitas vincit legem."* The
control ends when real justification ceases. It is
only a charitable obscuration of existing law.

In *Baker* v. *City of Grand Rapids,* 142 Mich. 687,
it appeared that:

"In January, 1903, the supply of coal in the city
of Grand Rapids was limited, with prospects of
great scarcity. Citizens could not readily obtain a
necessary quantity for household purposes."

Commissioners, appointed by the council, pur-
chased coal and disposed of it in the following man-
ner:

"Paupers were furnished coal free. Those poor
people who could pay something for coal furnished
were required to do so. Coal was also sold at cost
to those citizens who could not get any elsewhere."

The court held:

"The city authorities had the right, through the board of poor commissioners, to provide fuel for needy citizens, and under the then existing emergency, where a coal famine appeared imminent, were authorized to purchase such an amount of fuel in any market, as, in their opinion, would be necessary for that purpose. A municipality, however, cannot· enter into a commercial enterprise, such as buying and selling coal to its citizens as a business thereby entering into competition with dealers in coal. Such use of moneys is held not to be for a public purpose. *Opinion of the Justices,* 155 Mass. 601 (30 N. E. 1142, 15 L. R. A. 809), and cases cited."

It is true the bill in that case was dismissed on the ground that it did not appear the court had jurisdiction to restrain the proceeding in the absence of a showing that the activity might have resulted in a tax upon plaintiff's property amounting to $100 or more (Act No. 183, Pub. Acts 1903). In that case the reason for denying restraint of adjudicated unauthorized municipal action did not at all eliminate the mentioned holding. Act No. 183, Pub. Acts 1903, was repealed by Act No. 216, Pub. Acts 1905.

In the case at bar plaintiff desires to engage in a legitimate private business and has a right to be free from the unauthorized proprietary business activity of the municipality.

The decree is reversed and one will be entered here in accordance with this opinion. No costs.

FEAD, C. J., and NORTH, BUTZEL, SHARPE, and POTTER, JJ., concurred with WIEST, J.