CITY OF LANSING v EDWARD ROSE REALTY, INC

Docket Nos. 93256, 93257. Argued March 3, 1993 (Calendar No. 10). Decided July 2, 1993.

The City of Lansing brought condemnation actions in the Ingham Circuit Court against Edward Rose Realty, Inc., and Edward Rose Associates, Inc., seeking a determination of just compensation for the acquisition of easements to two of the defendant's apartment complexes to permit access by Continental Cablevision to provide cable television to apartment residents. Previously, the city and Continental had entered into franchise agreements providing Continental the right to operate a cable system within the city. In 1987, the city adopted ordinance 753, prohibiting owners of any dwelling from interfering with a resident's choice to receive cable service from the city franchisee, and also passed resolutions 446 and 557, specifically finding that the cable service provided by Continental to the defendant's complexes was in the public interest and constituted a public use, a public purpose, and a public necessity. The court, Carolyn Stell, J., following a bench trial, upheld the validity of the condemnation proceedings. The Court of Appeals, MARILYN J. KELLY, P.J., and MACKENZIE and GRIBBS, JJ., reversed, finding that the proposed condemnation exceeded the city's authority to take private property through eminent domain, and concluded that the primary beneficiary of the taking was not the public, but Continental (Docket Nos. 116531, 116532). The plaintiff appeals.

In an opinion by Justice RILEY, joined by Chief Justice CAVANAGH, and Justices LEVIN, BRICKLEY, BOYLE, and GRIFFIN, the Supreme Court held:

·The ordinance and resolutions are invalid as unreasonable and arbitrary because the public is not the primary beneficiary; the proposed conduct is beyond the city's authority to exercise the power of eminent domain.

1. The state and federal constitutions mandate that private property may not be taken for public use without just compensation. Because a municipality has no inherent power to condemn property even for public benefit or use, the power of eminent domain must be specifically conferred upon it by statute or the constitution, or by necessary implication from

delegated authority. In this case, the city attempted to condemn the defendant's property pursuant to the Uniform Condemnation Procedures Act and the home rule cities act, neither of which justifies the takings at issue. In addition, although the public interest advanced by the city is presumed valid, the private interest predominates, and the public therefore fails to justify the taking of private property.

2. Where a proposed government action confers a benefit on a private interest, an assertion of a predominately public purpose will be reviewed by a court with heightened scrutiny. The Legislature has not enunciated a general public purpose that city-franchised cable operators have mandatory access to all rental properties, or that the city's action serves an essential public purpose. Although the city would retain ownership of the easement, Continental would receive more than an incidental benefit. The asserted benefit to the public is not clear and significant, and does not predominate over the specific and identifiable private interest of Continental.

3. The city's proposed action would regulate cable services beyond limits established by Michigan or the federal government.

Affirmed.

Justice MALLETT, dissenting, stated that when the benefits of cable service are considered in light of Continental Cablevision's contractual obligations to the City of Lansing and the rapid technological advances in telecommunications, it is apparent that the public is the primary beneficiary of the condemnation.

192 Mich App 551; 481 NW2d 795 (1992) affirmed.

*Alvan P. Knot,* City Attorney, *Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Gregory L. McClelland* and *Jeffery V. Stuckey*), and *Latterman & Associates* (by *Mark A. Latterman*), for the City of Lansing.

*Farhat, Story & Kraus, P.C.* (by *Richard C. Kraus*), and *Winston & Strawn* (by *Deborah C. Costlow*), for the defendants.

Amici Curiae:

*Miller, Canfield, Paddock & Stone* (by *Michael J.*

*Hodge, Michael R. Atkins,* and *Clifford T. Flood)* for the Michigan Municipal League.

*O'Connor & Hannan* (by *John J. McDermott)* for the National Apartment Association.

RILEY, J. In this case we are asked to review a city ordinance providing for mandatory access to private property by the grantee of a city franchise for provision of cable television services. We hold the ordinance to be unreasonable and beyond the authority of the city to exercise the power of eminent domain.

I

In April 1974, the City of Lansing entered into a franchise agreement with Continental Cablevision, Inc., providing Continental with the nonexclusive right to operate its cable system in the City of Lansing. This agreement was amended ·several times and is currently in effect until the year 2004. Among other requirements, Continental agreed to provide nine designated access channels, an emergency override system, universal service, and to pay three percent of its gross revenues as a franchise fee to the city, retaining 0.35 percent of its gross revenues for funding of community cable services.

Defendants Rose own two apartment complexes, Trappers Cove and Waverly Park. In August 1980, Rose's predecessors in interest entered into a private agreement with Continental providing Continental with the exclusive right to install and operate its cable system for the properties. The agreement provided for amendment, modification, or cancellation if agreed to in writing by both parties, and established the rights and obligations

of the parties upon termination. On December 23, 1986, Rose gave Continental notice of an intention not to renew the contract upon its expiration on June 30, 1987.[1] Rose also informed Continental of an intention to install a private cable system, a "satellite master antenna television system" (SMATV), which would provide comparable cable service to the tenants of the apartment complexes.

In March 1987, Continental submitted a proposed ordinance to the city that would prohibit an owner of a multiple-unit residential dwelling from interfering with a tenant's choice to receive cable service from the city's franchisee. On June 1, 1987, the city adopted ordinance 753, providing:

> No owner, agent or representative of the owner of any dwelling shall directly or indirectly prohibit any resident of such dwelling from receiving cable communication installation, maintenance and services from a Grantee operating under a valid franchise issued by the City.

If an owner refused access by the franchised cable service, upon request of the franchisee the city could commence condemnation proceedings. The franchisee was responsible for indemnification of all expenses and costs incurred by the city. *Id.*

Rose indicated that it would refuse access to Continental upon expiration of their agreement, and on June 11, 1987, Continental requested that the city commence condemnation proceedings. On August 31, 1987, the city council passed resolution no. 446, providing that the city council deemed "multi-channel CATV service to Trappers Cover [sic] and Waverly Park to be in the public interest, and to constitute both a public use and a public

---

[1] The cable service agreement was extended until September 30, 1987.

purpose." Pursuant to the authority of ordinance 753, the city resolved to retain an appraiser to determine the fair-market value of Rose's property occupied by Continental, to make an offer to purchase the property, and to take steps necessary to acquire the property.[2] On November 9, 1987, the city council passed resolution no. 557, confirming "its finding in Resolution 446 that the service provided by Continental Cablevision, as a licensed franchisee, to residents of Trappers Cove and Waverly Park, is in the public interest, and constitutes a public use, a public purpose, and a public necessity." Resolution 557 also authorized the city attorney to take steps to acquire Rose's property pursuant to the Uniform Condemnation Procedures Act, MCL 213.51 *et seq.*; MSA 8.265(1) *et seq.,* including offering to purchase the property from Rose or, failing an agreement regarding the purchase, filing a complaint asking the court to "ascertain and determine just compensation to be paid for the acquisition of the Property."

Following the inability of the parties to agree to the purchase, on March 3, 1988, the city filed two complaints for condemnation. Rose filed its answers and affirmative defenses, as well as motions to review necessity pursuant to MCL 213.56(1); MSA 8.265(6)(1). The two cases were consolidated,

---

[2] Resolution no. 446 indicated that multichannel CATV services to Waverly Park and Trappers Cove would:

2. . . . encourage the growth and development of cable systems and assure that cable systems are responsive to the needs and interests of the City and its residents;

3. . . . assure that Continental Cable provides and is encouraged to provide the widest possible diversity of information sources and services to the public including informing the public of the operation of local, state and federal government;

4. . . . promote competition in cable communications and minimize unnecessary regulation that will or might impose an undue economic burden on cable systems . . . .

and a bench trial proceeded considering the necessity of the proposed taking.

The trial court denied Rose's motions to review necessity and upheld the validity of the condemnation proceedings. After the jury was impaneled to determine just compensation, Rose's application for leave to appeal to the Court of Appeals was granted and all proceedings in the trial court were stayed. The Court of Appeals reversed the judgment of the trial court, finding the proposed condemnation exceeded the city's authority to take private property through eminent domain. The Court concluded that "the primary beneficiary of the taking is not the public, but rather Continental Cablevision." 192 Mich App 551, 557; 481 NW2d 795 (1992). Further, "the proposed condemnation is an attempt by a private entity to use the city's taking powers to acquire what it could not get through arm's length negotiations with defendants." *Id.* at 558.

The city's application for leave to appeal to this Court was granted on November 4, 1992.[3]

II

Resolution of the question posed in this case requires that we turn first to our state and federal constitutions, mandating that private property shall not be taken for public use without just compensation. Const 1963, art 10, § 2; US Const, Am V. Because a municipality has no inherent power to condemn property even for public benefit or use,[4] the power of eminent domain must be specifically conferred upon the municipality by

[3] 441 Mich 880.

[4] *Sinas v City of Lansing,* 382 Mich 407, 411; 170 NW2d 23 (1969); *Kalamazoo v Titus,* 208 Mich 252; 175 NW 480 (1919). See also 3 Sands & Libonati, Local Government Law, § 21.11, p 21-26.

statute or the constitution, or by necessary impli-
cation from delegated authority.[5]

The city commenced this action for condemna-
tion pursuant to the Uniform Condemnation Pro-
cedures Act, MCL 213.56; MSA 8.265(6), to secure
for use by Continental that portion of Rose's prop-
erty required for operation of Continental Cable
services. However, the UCPA does not confer upon
a city the power of eminent domain, but rather
"provides standards for the acquisition of property
by an agency, the conduct of condemnation ac-
tions, and the determination of just compensa-
tion." MCL 213.52(1); MSA 8.265(2)(1). Hence in
order to employ the procedures of the UCPA, a city
must be authorized to exercise its power of emi-
nent domain by a statutory or constitutional dele-
gation of such power. In the instant case, the city
asserts authority to condemn Rose's property pur-
suant to a general statute applicable to acquisi-
tions by state agencies and public corporations and
the home rule cities act. MCL 117.1 *et seq.*; MSA
5.2071 *et seq.* MCL 213.23; MSA 8.13 provides:

> Any public corporation or state agency is
> authorized to take private property necessary for a
> public improvement or for the purposes of its
> incorporation or for public purposes within the
> scope of its power for the use or benefit of the
> public and to institute and prosecute proceedings
> for that purpose.

A public corporation or state agency[6] may com-

---

[5] Local governments have the limited powers "expressly conferred
upon them by the Constitution of the State of Michigan, by acts of the
Legislature, or necessarily implied therefrom." *Crain v Gibson,* 73
Mich App 192, 200; 250 NW2d 792 (1977), citing *Alan v Wayne Co,*
388 Mich 210; 200 NW2d 628 (1972). See also *Sinas,* n 4 *supra* at 411;
*In re Detroit, G H & M R Co,* 248 Mich 28, 32; 226 NW 663 (1929);
*Detroit v Oakland Circuit Judge,* 237 Mich 446, 451; 212 NW 207
(1927). See also 3 Sands & Libonati, n 4 *supra.*

[6] Public corporations include "all counties, cities, villages, boards,

mence condemnation proceedings when it has:

> declared . . . public purposes within the scope of
> its powers make it necessary, and . . . that it
> deems it necessary to take private property for
> such . . . public purposes within the scope of its
> powers, designating the same, and that the im-
> provement is for the use or benefit of the public.
> [MCL 213.24; MSA 8.14.]

In addition, the home rule cities act, MCL 117.4e;
MSA 5.2078 provides:

> Each city may in its charter[7] provide:
>
> * * *
>
> (2) For the acquisition by . . . condemnation
> . . . of private property . . . for any public use or
> purpose within the scope of its powers, whether
> herein specifically mentioned or not.

The home rule act is to be liberally construed.
Const 1963, art 7, § 34.[8] Although not a grant of
authority, the home rule act provides a framework
within which this Court reviews actions by a mu-
nicipal corporation.[9]

The city is authorized to condemn private prop-
erty for any public use within the scope of its
powers. The cited enabling statutes, however, do
not specifically authorize the takings in the pres-

commissions and agencies made corporations for the management and
control of public business and property . . . ." State agencies include
"all unincorporated boards, commissions and agencies of the state
given by law the management and control of public business and
property." MCL 213.21; MSA 8.11.

[7] In § 8-403 of its charter, the city addresses the establishment of
procedures by ordinance for the acquisition of real property by
condemnation. Sections 1-201 and 1-202 establish the city as a home
rule city and set forth its general powers.

[8] *Mikelsavage v Detroit,* 343 Mich 566; 73 NW2d 266 (1955); *Inch
Memorials v Pontiac,* 93 Mich App 532, 535; 286 NW2d 903 (1979).

[9] See *Square Lake Hills Condominium Ass'n v Bloomfield Twp,* 437
Mich 310, 319; 471 NW2d 321 (1991).

ent case. There is no state statute identifying as a public use or purpose the mandatory access onto private property by a city-franchised cable television provider. Ordinances passed under such general authority are open to inquiry by the courts and, in order to be held valid, must be reasonable and not oppressive.[10] Powers implied by general delegations of authority must be "essential or indispensable to the accomplishment of the objects and purposes of the municipality."[11]

We are therefore required to determine whether ordinance 753 is reasonable and serves a public purpose.[12] Ordinances are presumed to have a reasonable relation to a permissible governmental purpose. *Horton v Kalamazoo*, 81 Mich App 78, 81; 264 NW2d 128 (1978). We will not substitute our judgment for that of the city's officials, but rather will determine whether the city's proposed conduct is "within the range of conferred discretionary powers and then determine if it is reasonable."

---

[10] 5 McQuillin, Municipal Corporations (rev 3d ed), § 18.03, p 425.

[T]he court may consider and pass upon the reasonableness of a municipal ordinance based upon general home-rule powers and not specifically authorized by charter or statute . . . . [*State, County & Municipal Employees Local 339 v Highland Park*, 363 Mich 79, 86; 108 NW2d 898 (1961).]

[11] 5 McQuillin, n 10 *supra*, § 15.20, p 102. See also *Inch Memorials*, n 8 *supra* at 535; *Home Owners' Loan Corp v Detroit*, 292 Mich 511, 515; 290 NW 888 (1940); *Toebe v City of Munising*, 282 Mich 1, 15-16; 275 NW 744 (1937).

[12] We do not address the public necessity of the proposed takings in the present case because we find that the asserted public purpose is insufficient to justify the city's conduct.

Generally, the question of necessity for the exercise of the power of eminent domain has nothing to do with the question of what constitutes a public use. [11 McQuillin, Municipal Corporations (rev 3d ed), § 32.39.05, p 447. See also *Poletown Neighborhood Council v Detroit*, 410 Mich 616, 675, n 21; 304 NW2d 455 (1981) (RYAN, J., dissenting).]

*Square Lake Hills Condominium Ass'n v Bloom-
field Twp,* 437 Mich 310, 317; 471 NW2d 321
(1991). Although we assume the validity of the
public interest advanced by the city, we find that
the private interest to be benefited predominates
over the asserted public interest. The asserted
public interest therefore does not justify the pro-
posed taking of private property by the city.

While this is an issue of first impression in
Michigan, several states have enacted legislation
requiring some type of mandatory access to rental
properties by franchised cable services. Some stat-
utes have been held to be invalid because they
failed to provide just compensation for the prop-
erty taken to install and operate the cable sys-
tems.[13] Other statutes would preclude the city's
action in the present case if Rose's SMATV service
is considered comparable to the CATV provided by
Continental.[14] Still others are distinguishable from
the city's ordinance in the present case because
they require a tenant request for cable services
before a cable operator must be provided access to
residential property.[15] Other out-of-state statutes if
in effect in Michigan would appear to prohibit
Rose from refusing Continental access to the prop-

[13] The mandatory access statutes in Florida and Massachusetts
were held invalid for failure to provide for just compensation. Fla
Stat Ann 83.66, repealed, *Storer Cable TV v Summerwinds Apts,* 493
So 2d 417 (Fla, 1986); Mass Law Ann, ch 166A, § 22, *Greater Worces-
ter Cablevision, Inc v Carabetta Enterprises, Inc,* 682 F Supp 1244 (D
Mass, 1985); *Waltham Tele-Communications v O'Brien,* 403 Mass 747;
532 NE2d 656 (1989).

[14] See Fla Stat Ann 83.66, repealed. See also proposed § 633 of the
federal Cable Act, which was not enacted.

[15] See Mass Law Ann, ch 166A, § 22. In addition, see Conn Gen Stat
Ann 16-333a; 65 Ill Comp Stat Ann 5/11-42-11.1; 68 Pa Stat 250.503-B.

Lack of judicial interpretation of the following statutes leaves
unclear whether the state statutes require a tenant request before a
franchised cable operator may demand access to private property. Me
Rev Stat Ann, tit 14, § 6041; Nev Rev Stat 711.255; RI Gen Laws
39-19-10; Wis Stat Ann 66.085.

erty.[16] We are not persuaded, however, that the judicial interpretation of those statutes is applicable to the present case.

The New Jersey Court of Chancery determined that the purpose of the state law mandating access to multiple-dwelling units was to prevent landowners from excessively charging tenants who desire franchised cable services. *Princeton Cablevision, Inc v Union Valley Corp,* 195 NJ Super 257; 478 A2d 1234 (1983). In the present case, the city does not assert that a purpose of its proposed conduct was to protect Rose's tenants from discriminatory rates by Rose or that Rose was gouging the tenants with regard to previous franchised cable services or its current SMATV services.

In New York, the supreme court, again confronted with a state legislative enactment, reviewed the state statute articulating the public purposes to be furthered by cable television. *Loretto v Teleprompter Manhattan CATV Corp,* 53 NY2d 124, 139-140; 440 NYS2d 843; 423 NE2d 320 (1981).[17] The court determined that the tenant's right to receive communications, the educational and community aspects of CATV, the assurance of maximum penetration by cable systems, and the promotion of its rapid development, supported the mandatory access statute in light of previous "onerous fees and conditions" imposed by landlords on franchised cable systems that inhibited the franchised systems. *Id.* at 141.

[16] DC Code 43-1844.1; Minn Stat Ann 238.23; NJ Stat Ann 48:5A-49; NY, Executive Law, § 828. Although listed by the city as providing for mandatory access, Delaware's statute simply allows piggybacking by cable companies on easements used by public utilities. Del Code, tit 26, § 613. Virginia prohibits discriminatory rent requirements for tenants who choose to have cable, but does not provide for mandatory access by cable operators. Va Code 55-248.13:2.

[17] This decision was reversed for failure to provide just compensation for the taking of private property in *Loretto v Teleprompter Manhattan CATV Corp,* 458 US 419; 102 S Ct 3164; 73 L Ed 2d 868 (1982).

The Michigan Legislature has not enunciated as a general public purpose that city-franchised cable operators have mandatory access to all rental properties. There is no extensive regulation of the industry or any legislative pronouncement of the public benefits of franchised cable services as in New York and New Jersey.[18] Because the city passed ordinance 753 without an express delegation of authority by the state, we may review the city's asserted public purpose. Judicial deference granted state legislative determinations of public use[19] is not similarly employed when reviewing determinations of public purpose made by a municipality pursuant to broad, general enabling statutes. Thus, we scrutinize the city's actions bearing in mind that a state statute would affect all municipalities in Michigan and several cable companies, while ordinance 753 is directed toward and would benefit a single private entity, Continental.

In *Poletown Neighborhood Council v Detroit,* 410 Mich 616, 629; 304 NW2d 455 (1981), this Court addressed a proposed taking that benefited a private entity. The precise issue considered was:

> Can a municipality use the power of eminent domain granted to it by the Economic Development Corporations Act, MCL 125.1601 *et seq.*; MSA 5.3520(1) *et seq.,* to condemn property for transfer to a private corporation . . . ?

---

[18] See NJ Stat Ann 48:5A-2; NY, Executive Law, § 811.

[19] See *Berman v Parker,* 348 US 26; 75 S Ct 98; 99 L Ed 27 (1954); *Hawaii Housing Authority v Midkiff,* 467 US 229; 104 S Ct 2321; 81 L Ed 2d 186 (1984); *Poletown,* n 12 *supra.*

While state legislative determinations of public purpose may be "well-nigh conclusive" in judicial actions, *Berman, supra* at 32, a municipality acting without specific legislative authority must "specify definitely the purpose of the appropriation" to show that its conduct is within its authority. *Cincinnati v Vester,* 281 US 439, 447; 50 S Ct 360; 74 L Ed 950 (1930). Mere statements that the proposed action furthers a public use is not conclusive.

The "heart" of the dispute was "whether the proposed condemnation [was] for the primary benefit of the public or the private user." *Id.* at 632. The role of this Court to review whether the project was for the primary benefit of the public was limited, mainly because of three circumstances: 1) the Legislature had determined that the government conduct proposed by the city served "an essential public purpose," 2) the Legislature expressly delegated to municipalities the authority to determine if a proposed project constituted a public purpose,[20] and 3) the city followed all procedures established in the legislative enabling statute. *Id.* at 632-633. The Court then held that the proposed project was a valid exercise of the city's power of eminent domain, finding: 1) the benefit to the municipality was clear and significant, 2) the project was an intended and legitimate object of the Legislature, 3) the power to undertake the proposed action was expressly delegated the municipality, and 4) the public benefit predominated over the benefit received by the private party. *Id.* at 634. Because a private party would benefit from the city's proposed project, eminent domain would not be proper without substantial proof that the public would be the primary beneficiary of the project. *Id.* Where the project "benefits specific and identifiable private interests," the assertion of a predominant public interest will be examined by the Court with "heightened scrutiny." *Id.* at 634-635.

> Such public benefit cannot be speculative or marginal but must be clear and significant if it is to be within the legitimate purpose as stated by the Legislature. [*Id.* at 635.]

---

[20] MCL 125.1610(2); MSA 5.3520(10)(2).

Hence, where a proposed government action confers a benefit on a private interest, unless that benefit is merely incidental, a reviewing court will inspect with heightened scrutiny the assertion by the governmental entity of a public purpose.

In the present case, as discussed above, there is no determination by the Legislature that the city's proposed action serves an essential public purpose. The Legislature did not delegate to the city the power to condemn private property for the purpose of providing mandatory access by a city-franchised cable system. Although the city will retain ownership of the easement it proposed to obtain through condemnation, Continental will receive more than an incidental benefit. The easement will not merely provide access for public, education, and government (PEG) channels or an emergency override, but will allow Continental to offer its full panoply of services to the tenants of Rose's apartments.[21] Continental could receive substantial revenue through subscription payments and increased market value of its overall system. We therefore apply heightened scrutiny to the city's assertion that a public interest is predominant because a "specific and identifiable" interest will be benefited by the city's proposed action. Finally, as explained below, the asserted benefit to the public is not clear and significant, and does not predominate over the specific and identifiable private interest of Continental.

The city asserts that the requirements of PEG channels, universal service, and emergency over-

[21] The ordinance proposed by Continental provided for mandatory access only to multiple dwelling units. As passed, ordinance 753 requires access to any "dwelling." A "dwelling" is not limited to multiple dwelling units and is defined in ordinance 753 as including, but not limited to, "buildings, apartments, townhouses, coöperatives, condominiums and mobile home parks."

ride support its determination of public use.[22] We agree with the conclusion by the Court of Appeals that the requirement of universal service is not, in and of itself, a public purpose. 192 Mich App 556. If the service does not further a public purpose, then universal provision of that service does not advance a public purpose. *Id.* Furthermore, the universal service requirement is primarily a restraint on the franchised cable operator, precluding the company from refusing service to poorer communities. *Id.* It is not an enabling provision authorizing the cable operator to demand access to every dwelling despite the owner's desire for such service. We also agree with the conclusion by the Court of Appeals that the emergency override capacity of CATV is largely duplicative of commercial stations and does not support invasion of an owner's private property. *Id.*[23]

We do not dispute that PEG channels can provide the public with political and educational benefits. In fact, Congress has declared that government has a substantial interest in ensuring the continuation and availability of both local origination programming and local noncommercial educational stations.[24] Despite these clear statements of policy recognizing the benefits to the public pro-

[22] The city also advances in support of its position several cases requiring judicial deference to legislative determinations of public use. See *ante,* pp 635-637. The cases are plainly distinguishable from the present case either because the only issue involved just compensation, *Loretto, supra,* 458 US 419, or because the state legislature had determined the public use and benefit of CATV, and had extensively regulated the taking of private property to require access. *Loretto, supra,* 53 NY2d 124; *Lake Louise Improvement Ass'n v Multimedia Cablevision of Oak Lawn, Inc,* 157 Ill App 3d 713; 510 NE2d 982 (1987); *Times Mirror Cable Television of Springfield, Inc v First Nat'l Bank of Springfield,* 221 Ill App 3d 340; 582 NE2d 216 (1991).

[23] We also agree that the franchise fee paid to the city is not a legitimate ground for taking private property. 192 Mich App 557.

[24] See Cable Television Consumer Protection and Competition Act of 1992, findings and policy, PL 102-385, § 2(a)(7), (10), 106 Stat 1460.

vided by the availability of PEG channels,[25] in light
of the countervailing private benefits conferred by
the mandatory access ordinance, we find that the
primary beneficiary of this ordinance is Continen-
tal, a private user, not the public.

Ordinance 753 presents no definition of the pub-
lic purpose allegedly served by requiring access by
its franchised cable operator. Resolution 446 in-
cludes three asserted purposes: to encourage
growth, development, and responsiveness of Conti-
nental; to encourage provision by Continental of
the widest possible diversity of information; and to
promote competition and minimize unnecessary
regulation that might impose undue economic bur-
dens on the cable system.[26] In light of Continen-
tal's extensive private interest, we find these as-
serted rationales for mandatory access to Rose's

[25] Rose's tenants may still utilize the broadcasting services required
in the franchise agreement to be provided by Continental for use by
city residents.

[26] Identical reasons are cited as purposes of the federal Cable Act,
47 USC 521. It is instructive to note here that, although considered, a
mandatory access provision was not included in the Cable Act.

In 1984, Congress stated that one purpose of the Cable Communica-
tions Policy Act was to promote competition in the cable industry. See
47 USC 521(6). Because of continued high concentration in the cable
industry, the Cable Television Consumer Protection and Competition
Act of 1992 again addressed the need to encourage competition and
alternative sources of programming. For instance, in § 2(a)(2) of the
1992 act, findings and policy, Congress states:

> For a variety of reasons, including local franchising require-
> ments and the extraordinary expense of constructing more
> than one cable television system to serve a particular geo-
> graphic area, most cable television subscribers have no opportu-
> nity to select between competing cable systems. Without the
> presence of another multichannel video programming distribu-
> tor, a cable system faces no local competition. The result is
> undue market power for the cable operator as compared to that
> of consumers and video programmers.

Therefore, one of the purposes of the 1992 act is to "ensure that cable
television operators do not have undue market power vis-à-vis video
programmers and consumers." *Id.* at § 2(b)(5).

properties to be insufficient to overcome Rose's right to exclude others from its private property.[27]

There is no explanation regarding how mandatory access to Rose's two apartment complexes encourages growth, development, and responsiveness of Continental, or how such access encourages Continental to provide the widest possible diversity of information. Mere statements that a proposed action furthers a public benefit are not conclusive. *Cincinnati v Vester,* 281 US 439, 447; 50 S Ct 360; 74 L Ed 950 (1930).

The argument is persuasive that ordinance 753 will not increase competition in the cable industry. While allowing Continental to initiate condemnation proceedings to secure cable access to any dwelling in Lansing, no corollary rights are granted other cable systems. Continental will be guaranteed the ability to compete with private cable systems where it decides to compete, without an equivalent right of competition guaranteed to private systems. Access to private dwellings pursuant to ordinance 753 is enforceable only by the franchised cable operator.[28] Neither Rose, the city, nor tenants could initiate condemnation proceedings to ensure competition of cable systems. Moreover, Continental has entered into exclusive cable service contracts in ninety percent of its contracts in Lansing. Even if private systems were allowed

---

[27] A component of a private owner's property rights is the right to exclude others. *Loretto, supra,* 458 US 435; *Cable Holdings of Georgia, Inc v McNeil Real Estate Fund VI, Ltd,* 953 F2d 600, 605 (CA 11, 1992).

[28] The landowner in *McNeil,* n 27 *supra,* asserted that mandatory access by the franchised cable company would be anticompetitive. Nonfranchised cable companies would be at a competitive disadvantage because the right of access was enforceable only by the franchised cable operators. *Id.* at 607. The court noted that although they would not reach that issue, even the federal Cable Act did not create such an "unequal regime." *Id.* at 608, n 5.

to compete, ninety percent of the market is already secured by Continental.[29]

Finally, the proposed action would regulate cable services beyond limits established by Michigan or the federal government. In the 1992 Cable Act, Congress amended several provisions regulating the cable industry. Although a mandatory access provision was contemplated, it was deleted before the Cable Act was enacted. Such a deletion is evidence of Congress' intent not to provide for mandatory access. *Cable Holdings of Georgia, Inc v McNeil Real Estate Fund VI, Ltd,* 953 F2d 600, 607 (CA 11, 1992). In the provision as it was considered, if equivalent services were provided by an owner, access by franchised CATV was not required. The owner had the choice either to provide comparable services or be subject to mandatory access by the franchised cable operator.[30]

III

The city's proposed conduct to require mandatory access by its franchised cable operator, Continental, onto Rose's private property does not result from a state legislative pronouncement of public purpose, nor has the Legislature specifically delegated to municipalities the authority to undertake the actions proposed by the city. Rather, the city enacted resolutions 446 and 557 on the basis of its own general assertion that mandatory access by its only franchisee furthers a public purpose.

[29] Furthermore, if ordinance 753 were held to be valid, all of Continental's contracts would violate the mandatory access provision. Assuming another cable system could enter the market because the city has granted a nonexclusive franchise to Continental, if such a system were granted a franchise, it would be entitled to mandatory access to all dwellings, even those in which Continental has exclusive contracts.

[30] The Michigan Legislature has enacted no provisions regarding the regulation of access by the public to CATV.

The conduct by the city, however, benefits Continental, a specific and identifiable private interest. We are persuaded that this benefit to Continental predominates over the asserted public benefits. The ordinance and resolutions are therefore invalid as unreasonable because the public would not be the primary beneficiary. Hence, the proposed conduct is beyond the city's authority to exercise the power of eminent domain.

The decision of the Court of Appeals is affirmed.

CAVANAGH, C.J., and LEVIN, BRICKLEY, BOYLE, and GRIFFIN, JJ., concurred with RILEY, J.

MALLETT, J. (*dissenting*). The majority concludes that the private benefit to Continental "predominates over the asserted public benefits,"[1] and that the "ordinance[s] and resolutions are therefore invalid as unreasonable because the public would not be the primary beneficiary."[2] I disagree.

In *Poletown Neighborhood Council v Detroit*, 410 Mich 616, 632; 304 NW2d 455 (1981), this Court succinctly stated the guidelines for determining whether a particular condemnation is within the scope of the city's power of eminent domain.

> All agree that condemnation for a public use or purpose is permitted. All agree that condemnation for a private use or purpose is forbidden. Similarly, condemnation for a private use cannot be authorized whatever its incidental public benefit and condemnation for a public purpose cannot be forbidden whatever the incidental private gain. The heart of this dispute is whether the proposed condemnation is for the primary benefit of the public or the private user.

---

[1] *Ante* at 644.

[2] *Id.*

. The majority concludes that the public benefit of cable television service fails to outweigh the private benefit conferred upon Continental Cablevision. However, when the benefits of cable service are considered in light of Continental's contractual obligations to the City of Lansing and the technological advances occurring rapidly in telecommunications, it becomes apparent that the public is the primary beneficiary of the condemnation.

The City of Lansing established that Continental provides a variety of services that Rose's satellite system "does not, and cannot, provide." The majority fails to give due consideration to the breadth of services offered through the broadcast of public, educational, and governmental channels (PEG channels). Continental currently offers nine PEG channels. A government channel, broadcast from city hall, carries a host of political programs. Three channels offer telecourses from Michigan State University and Lansing Community College. These telecourses allow individuals with family and employment commitments to continue their education while at home. A designated public access channel provides a forum for citizens who traditionally have limited access to avenues for the dissemination of ideas. The franchise agreement requires Continental to provide equipment, training, and assistance to the public. Additionally, there are religious access, local origination, Lansing school district, and library PEG channels.

The services and programming provided through the PEG channels must be considered in accordance with Continental's contractual obligations and the ever-developing technology in order to ascertain the true public benefit. Continental has agreed, pursuant to the franchise agreement, to maintain state-of-the-art equipment and technology. This obligation is no small task, for even the casual

observer of the evening news is aware of the almost daily advances being made in telecommunications. In an effort to meet this obligation, Continental is required to prepare periodically a report evaluating developments in technical programming service and the feasibility of implementation into its system. Some recent developments, including interactive two-way systems and on-screen home computer capabilities, indicate clearly that the vast potential of cable television service is coming to the fore.

Further, by agreeing to provide universal service, Continental has ensured that all residents, regardless of economic status, will have access to these services. The majority refers to the universal service requirement as a "restraint on the franchised cable operator, precluding the company from refusing service to poorer communities."[3] I prefer to interpret the universal service requirement as a fundamental recognition by the franchised operator that the benefits of cable service should be realized by all segments of the community. In fact, there is evidence in the record suggesting that such a realization has already occurred.[4] Thus, when the PEG channels, Continental's contractual obligations, and rapid technological advances are considered in the aggregate, I believe that the condemnation in the present case is for the primary benefit of the public user.

---

[3] *Ante* at 640.

[4] The spring 1988 telecourse from Lansing Community College was received by eighteen students with a household income of less than $10,000, twelve students between $10,000 and $19,999, and thirty-three students between $20,000 and $29,999.

I would reverse the decision of the Court of Appeals.[5]

---

[5] Because the majority does not reach the issues raised by the cross-appellant, I decline to do so as well.